# EXHIBIT "2"



RE: Certificate Number  CHL 01-05226-23

Welcome to County Hall Insurance Company, Inc., a Risk Retention Group

ROAD BANG EXPRESS INC

3620 NW 30TH AVE LOT E506

MIAMI, FL 33142

Welcome to County Hall Insurance Company, Inc., a Risk Retention Group.  Your policy and description of coverage is attached.  Please read it carefully and keep it with your important papers.

I would like to thank you for purchasing your policy from County Hall Insurance Company, Inc., a Risk Retention Group and look forward to serving your insurance needs.

In the unlikely event that you have the need to contact our claims department, they can be reached at 888-816-2227 or email claim@countyhallrrg.com.  Please have your policy number available when you contact them.

If you have specific questions about your policy or the coverages you purchased, please contact your agent directly.

Sincerely,

Gerard Vince
President
County Hall Insurance Company, Inc., a Risk Retention Group

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane, Suite 110 #226
Charlotte, NC 28204

**NAIC #**15947

## <span style="color:red">IMPORTANT NOTICE</span>
### To All Insured Members

## Claims

All claims regardless of fault **MUST BE REPORTED** to us **IMMEDIATELY**. Claims **NOT** reported immediately may jeopardize coverage or result in your policy being **CANCELED**.

## Drivers

All new drivers hired during the policy term **MUST BE REPORTED** to us immediately. Accidents with **UNREPORTED, NON-SCHEDULED** drivers **ARE EXCLUDED** from coverage and will be viewed as an increase in **HAZARD/EXPOSURE**, which may result in **CANCELLATION** or **NONRENEWAL** of your policy.

## Vehicles

If we filed a **REGULATORY FILING** on your behalf, all units you own, operate and/or lease **MUST BE SCHEDULED** on your policy. Vehicles **NOT SCHEDULED** will result in immediate **CANCELLATION** of your policy**.**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane, Suite 110 #226,
Charlotte, NC 28204
**NAIC #** 15947

## CERTIFICATE OF AUTOMOBILE LIABILITY INSURANCE

## DECLARATIONS

**Master Policy Number: CHI4815162342HI**

**Certificate Number: CHL 01-05226-23**

**(X)** Annual Premium Basis          **(  )** Monthly Premium Basis

**ITEM ONE**
Member Insured Name and Address:

ROAD BANG EXPRESS INC
3620 NW 30TH AVE LOT E506
MIAMI, FL 33142

This Certificate of Automobile Liability Insurance attaches to and forms a part of the Master Policy Number described above.  This Certificate of Automobile Liability Insurance shall take effect for the period described below, and shall be subject to the terms and conditions stated in the governing Master Policy attached herewith:

Policy Period:

Effective: 07/27/2023 At 12:01 A.M. Standard Time at your mailing address.

Expires: 07/27/2024 At 12:01 A.M. Standard Time at your mailing address.

**NOTICE**

**This Policy Is Issued By Your Risk Retention Group. Your Risk Retention Group May Not Be Subject To All Of The Insurance Laws And Regulations Of Your State. State Insurance Insolvency Guaranty Funds Are Not Available For Your Risk Retention Group.**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane, Suite 110 #226,
Charlotte, NC 28204
**NAIC # 15947**

**Note:** Officers' facsimile signatures may be inserted here at the company's option.
**Countersignature of Authorized Representative:**

**Gerard Vince, President**
**Dated: 07/27/2023**

**ITEM TWO**

## Schedule of Coverages

This Certificate of Automobile Liability Insurance provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those "autos" shown as covered "autos" and which appear on the Schedule of Covered Autos shown herein. **"Autos" are shown as covered "autos" for a particular coverage by the entry of one or more of the symbols from the Covered Autos Section of the Motor Carriers Coverage Form next to the name of the coverage.**

**Motor Carriers Coverage Form; Coverage is provided where a premium is shown.**

| Coverage | Symbol | Limit | Monthly Premium | Annual Premium |
|---|---|---|---|---|
| Automobile Liability | 67 | $1,000,000 | | $14,848.00 |
| Personal Injury Protection | 67 | Stated in Each Personal Injury Protection Endorsement Minus $ Deductible | | $104.00 |
| Added Personal Injury Protection | | Stated in Each Added Personal Injury Protection Endorsement Minus $ Deductible | | |
| Medical Expense & Income | | | | |
| Loss Benefits (VA Only) | | | | |
| Uninsured Motorists | | NONE | | |
| Underinsured Motorists | | NONE | | |

| | |
|---|---|
| Policy Premium: | $14,952.00 |
| Capital Contribution: | |
| Subscription Fee: | $1,241.02 |
| Risk Management/RPG Fee: | $0.00 |
| Tax: | $807.41 |
| Total: | $17,000.43 |

**Note:    Advance premium is refunded at policy termination less any amounts due to insurer.**

**Symbol Definitions:**
**Symbol 61** – Any Auto, **Symbol 62** – Owned Autos Only, **Symbol 63** – Owned Private Passenger Vehicles, **Symbol 64** – Owned Commercial Autos Only, **Symbol 65** – Owned Autos Subject to No-Fault Laws, **Symbol 66** – Owned Autos Subject to Compulsory Uninsured Motorist Laws, **Symbol 67** – Specified Described Autos, **Symbol 68** – Hired Auto Only, **Symbol 69** – Trailers in Your Possession Under a Trailer Interchange Agreement, **Symbol 70** – Your Trailers in the Possession of Another Trucker Under a Trailer Interchange Agreement, **Symbol 71** – Non-Owned Autos Only.

**ITEM THREE**

## Schedule of Covered Autos

| No. | Year | Make | Type | Serial No. | Radius | Added | Removed |
|-----|------|------|------|-----------|--------|-------|---------|
| 1 | 2005 | FREIGHTLINER | Tractor | 1FUJA6CK85LN96426 | LH | 07/27/2023 | |

**ITEM FOUR**

**Hired or Borrowed Covered Auto Coverage and Premiums**

Cost of Hire means:
(a)   The total dollar amount of costs you incurred for the hire of automobiles (includes trailers and semitrailers), and, if not included therein;
(b)   The total remunerations of all operators and drivers' helpers, of hired automobiles, whether hired with a driver by lessor or an "employee" of the lessee, or any other third party; and
(c)   The total dollar amount of any other costs (e.g. repair, maintenance, fuel, etc.) directly associated with operating the hired automobiles, whether such costs are absorbed by the "insured", paid to the lessor or owner, or paid to others.

| Estimated Cost of Hire | Rate Per Each $100 Cost of Hire | Total Estimated Premium |
|------------------------|--------------------------------|-------------------------|
| | | |

**ITEM FIVE**

**Schedule for Non-Ownership Liability**

| Rating Basis | Number | Premium |
|--------------|--------|---------|
| Number Of Employees: | | |

**The following regulatory filings have been issued on your behalf:**

[ X ]   **Federal Motor Carrier Safety Administration**

[  ]   **Specific State Regulatory Filings for the following states**

[ X ]   **USDOT MCS-90**

**NOTE**: Per the terms of these filings made on your behalf **you agree to reimburse** County Hall Insurance Company, Inc., a Risk Retention Group for any payment made by County Hall Insurance Company, Inc., a Risk Retention Group on account of any accident, claim, or suit involving **a breach of the terms of this policy**, and for any payment that County Hall Insurance Company, Inc., a Risk Retention Group would **not have been obligated to make under the provisions of the policy** except for the agreements contained in these filings.

**USDOT Number:** 4085799    **Date Received:** 07/27/2023

Please note, the expiration date as stated on this form relates to the process for renewing the Information Collection Request for this form with the Office of Management and Budget. This requirement to collect information as requested on this form does not expire. For questions, please contact the Office of Registration and Safety Information, Registration, Licensing, and Insurance Division.

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.



United States Department of Transportation
**Federal Motor Carrier Safety Administration**

## Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980

# FORM MCS-90

**Issued to** ROAD BANG EXPRESS INC **of** FLORIDA
*(Motor Carrier name)*       *(Motor Carrier state or province)*

**Dated at** 12:00 midnight **on this** 27th **day of** July , 2023

**Amending Policy Number:** CHL 01-05226-23     **Effective Date:** 07/27/2023

**Name of Insurance Company:** County Hall Insurance Company, Inc., a Risk Retention Group

**Countersigned by:** _____
*(authorized company representative)*

The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown *(check only one)*:

- ⦿ *This insurance is primary and the company shall not be liable for amounts in excess of $* 750,000 *for each accident.*
- ◯ *This insurance is excess and the company shall not be liable for amounts in excess of $* _____ *for each accident in excess of the underlying limit of $* _____ *for each accident.*

Whenever required by the Federal Motor Carrier Safety Administration (FMCSA), the company agrees to furnish the FMCSA a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FMCSA , to verify that the policy is in force as of a particular date. The telephone number to call is: 760-487-7399.

Cancellation of this endorsement may be effected by the company or the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the FMCSA's registration requirements under 49 U.S.C. 13901, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date the notice is received by the FMCSA at its office in Washington, DC).

**Filings must be transmitted online via the Internet at http://www.fmcsa.dot.gov/urs**

*(continued on next page)*

## DEFINITIONS AS USED IN THIS ENDORSEMENT

*Accident* includes continuous or repeated exposure to conditions or which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

*Motor Vehicle* means a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

*Bodily Injury* means injury to the body, sickness, or disease to any person, including death resulting from any of these.

*Property Damage* means damage to or loss of use of tangible property.

*Environmental Restoration* means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish, and wildlife.

*Public Liability* means liability for bodily injury, property damage, and environmental restoration.

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of anyone accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

*(continued on next page)*

# SCHEDULE OF LIMITS — PUBLIC LIABILITY

| Type of carriage | Commodity transported | January 1, 1985 |
|---|---|---|
| **(1)** For-hire (in interstate or foreign commerce, with a gross vehicle weight rating of 10,001 or more pounds). | Property (nonhazardous) | $750,000 |
| **(2)** For-hire and Private (in interstate, foreign, or intrastate commerce, with a gross vehicle weight rating of 10,001 or more pounds). | Hazardous substances, as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hopper-type vehicles with capacities in excess of 3,500 water gallons; or in bulk Division 1.1, 1.2, and 1.3 materials, Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; in bulk Division 2.1 or 2.2; or highway route controlled quantities of a Class 7 material, as defined in 49 CFR 173.403. | $5,000,000 |
| **(3)** For-hire and Private (in interstate or foreign commerce, in any quantity; or in intrastate commerce, in bulk only; with a gross vehicle weight rating of 10,001 or more pounds). | Oil listed in 49 CFR 172.101; hazardous waste, hazardous materials, and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | $1,000,000 |
| **(4)** For-hire and Private (In interstate or foreign commerce, with a gross vehicle weight rating of less than 10,001 pounds). | Any quantity of Division 1.1, 1.2, or 1.3 material; any quantity of a Division 2.3, Hazard Zone A, or Division 6.1, Packing Group I, Hazard Zone A material; or highway route controlled quantities of a Class 7 material as defined in 49 CFR 173.403. | $5,000,000 |

*The schedule of limits shown does not provide coverage. The limits shown in the schedule are for information purposes only.

COMMERCIAL  AUTO                                                              CHI – 170 (05/18)

---

# FORMS SCHEDULE

CHI - 140 (12-20)          County Hall Cover Letter
CHI CERT 2019-05-01        Declarations
MCS90                      Endorsement for Motor Carrier Policies
CHI - 170 (05/18)          Forms Schedule
CA 00 20 10 13             Motor Carrier Coverage Form
IL 00 17 11 98             Common Policy Conditions
CHI – 370 (05/19)          Exclusion of Non-Scheduled Drivers
CA 23 01 10 13             Explosives
CA 23 05 10 13             Wrong Delivery of Liquid Products
CA 23 94 03 06             Silica or Silica-Related Dust Exclusion for Covered Autos Exposure
IL 00 21 09 08             Nuclear Energy Liability Exclusion Endorsement (Broad Form)
IL 09 13 04 98             Insurance Inspection Services Exemption from Liability
CHI - 210 (05/18)          Punitive Damages Exclusion Endorsement (Liability Coverages)
CHI - 240 (12/18)          Membership Notification
CHI - 280 (12/18)          Offering Memorandum
CHI - 100 (09/20)          Amended and Restated Operating Agreement
CA 01 28 06 17             Florida Changes
CA 02 67 06 17             Florida Changes - Cancellation and Nonrenewal
CHI - 290 (02/19)          MCS-90 Reimbursement Endorsement
CHI - 301 (02/19)          Extrinsic Evidence, Independent Counsel and Choice of Law Endorsement
CHI – 310 (02/19)          Cross Suits Exclusion Endorsement
CHI – 320 (02/19)          Employee Indemnification, Employer's Liability, And Contractor Damages
CHI – 330 (02/19)          Certain Scheduled Autos Deemed Covered Autos You Own
CHI – 360 (05/19)          Use of Covered "Trailer" By Others Exclusion
CHI – 380 (05/19)          Passenger Exclusion Endorsement
CA 22 10 02 18             Florida Personal Injury Protection
CHI-CRI 12/20              Policyholder Notice - Claim Reporting Instructions

# MOTOR CARRIER COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VI** – Definitions.

## SECTION I – COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description Of Covered Auto Designation Symbols**

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| **61** | Any "Auto" | |
| **62** | Owned "Autos" Only | Only the "autos" you own (and for Covered Autos Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those "autos" you acquire ownership of after the policy begins. |
| **63** | Owned Private Passenger Type "Autos" Only | Only the "private passenger type" "autos" you own. This includes those "private passenger type" "autos" that you acquire ownership of after the policy begins. |
| **64** | Owned Commercial "Autos" Only | Only those trucks, tractors and "trailers" you own (and for Covered Autos Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those trucks, tractors and "trailers" you acquire ownership of after the policy begins. |
| **65** | Owned "Autos" Subject To No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the no-fault law in the state where they are licensed or principally garaged. |
| **66** | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that, because of the law in the state where they are licensed or principally garaged, are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| **67** | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Covered Autos Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| **68** | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "private passenger type" "auto" you lease, hire, rent or borrow from any member of your household, any of your "employees", partners (if you are a partnership), members (if you are a limited liability company), or agents or members of their households. |
| **69** | "Trailers" In Your Possession Under A Written Trailer Or Equipment Interchange Agreement | Only those "trailers" you do not own while in your possession under a written "trailer" or equipment interchange agreement in which you assume liability for "loss" to the "trailers" while in your possession. |

 © Insurance Services Office, Inc., 2011

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| 70 | Your "Trailers" In The Possession Of Anyone Else Under A Written Trailer Interchange Agreement | Only those "trailers" you own or hire while in the possession of anyone else under a written "trailer" interchange agreement. When Symbol **70** is entered next to a Physical Damage Coverage in Item Two of the Declarations, the Physical Damage Coverage exclusion relating to "loss" to a "trailer" in the possession of anyone else does not apply to that coverage. |
| 71 | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "private passenger type" "autos" owned by your "employees" or partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs. |
| 79 | "Mobile Equipment" Subject To Compulsory Or Financial Responsibility Or Other Motor Vehicle Insurance Law Only | Only those "autos" that are land vehicles and that would qualify under the definition of "mobile equipment" under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged. |

**B. Owned Autos You Acquire After The Policy Begins**

1. If Symbols **61, 62, 63, 64, 65, 66** or **79** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol **67** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

   a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

   b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos**

If Covered Autos Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Covered Autos Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto".

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

   a. Breakdown;

   b. Repair;

   c. Servicing;

   d. "Loss"; or

   e. Destruction.

**SECTION II – COVERED AUTOS LIABILITY COVERAGE**

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

 © Insurance Services Office, Inc., 2011

We will have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Covered Autos Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1. Who Is An Insured**

The following are "insureds":

**a.** You for any covered "auto".

**b.** Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

**(1)** The owner or any "employee", agent or driver of the owner, or anyone else from whom you hire or borrow a covered "auto".

**(2)** Your "employee" or agent if the covered "auto" is owned by that "employee" or agent or a member of his or her household.

**(3)** Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), a lessee or borrower of a covered "auto" or any of their "employees", while moving property to or from a covered "auto".

**(5)** A partner (if you are a partnership), or member (if you are a limited liability company), for a covered "auto" owned by him or her or a member of his or her household.

**c.** The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected, is being used exclusively in your business.

**d.** The lessor of a covered "auto" that is not a "trailer" or any "employee", agent or driver of the lessor while the "auto" is leased to you under a written agreement if the written agreement between the lessor and you does not require the lessor to hold you harmless and then only when the leased "auto" is used in your business as a "motor carrier" for hire.

**e.** Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

However, none of the following is an "insured":

**(1)** Any "motor carrier" for hire or his or her agents or "employees", other than you and your "employees":

**(a)** If the "motor carrier" is subject to motor carrier insurance requirements and meets them by a means other than "auto" liability insurance.

**(b)** If the "motor carrier" is not insured for hired "autos" under an "auto" liability insurance form that insures on a primary basis the owners of the "autos" and their agents and "employees" while the "autos" are leased to that "motor carrier" and used in his or her business.

However, Paragraph **(1)** above does not apply if you have leased an "auto" to the for-hire "motor carrier" under a written lease agreement in which you have held that "motor carrier" harmless.

**(2)** Any rail, water or air carrier or its "employees" or agents, other than you and your "employees", for a "trailer" if "bodily injury" or "property damage" or a "covered pollution cost or expense" occurs while the "trailer" is detached from a covered "auto" you are using and:

**(a)** Is being transported by the carrier; or

**(b)** Is being loaded on or unloaded from any unit of transportation by the carrier.

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the "insured":

**(1)** All expenses we incur.

**(2)** Up to $2,000 for the cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

**(3)** The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

**(4)** All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

**(5)** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**(6)** All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b. Out-of-state Coverage Extensions**

While a covered "auto" is away from the state where it is licensed, we will:

**(1)** Increase the Limit of Insurance for Covered Autos Liability Coverage to meet the limit specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing "motor carriers" of passengers or property.

**(2)** Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of "loss" because of these extensions.

## B. Exclusions

This insurance does not apply to any of the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

**2. Contractual**

Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages:

**a.** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

**b.** That the "insured" would have in the absence of the contract or agreement.

**3. Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4. Employee Indemnification And Employer's Liability**

"Bodily injury" to:

**a.** An "employee" of the "insured" arising out of and in the course of:

**(1)** Employment by the "insured"; or

**(2)** Performing the duties related to the conduct of the "insured's" business; or

**b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract". For the purposes of the Coverage Form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

"Bodily injury" to:

**a.** Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

    **b.** The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **a.** above.

**6. Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7. Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

    **a.** Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

    **b.** After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

**8. Movement Of Property By Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

**9. Operations**

"Bodily injury" or "property damage" arising out of the operation of:

    **a.** Any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment"; or

    **b.** Machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

**10. Completed Operations**

"Bodily injury" or "property damage" arising out of "your work" after that work has been completed or abandoned.

In the exclusion, your work means:

    **a.** Work or operations performed by you or on your behalf; and

    **b.** Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraph **a.** or **b.** above.

Your work will be deemed completed at the earliest of the following times:

    **(1)** When all of the work called for in your contract has been completed;

    **(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site; or

    **(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**11. Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **a.** That are, or that are contained in any property that is:

        **(1)** Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

        **(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

        **(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

    **b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

    **c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined resulting from any one "accident" is the Limit Of Insurance for Covered Autos Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

**SECTION III – TRAILER INTERCHANGE COVERAGE**

**A. Coverage**

**1.** We will pay all sums you legally must pay as damages because of "loss" to a "trailer" you don't own or its equipment under:

**a. Comprehensive Coverage**

From any cause except:

**(1)** The "trailer's" collision with another object; or

**(2)** The "trailer's" overturn.

**b. Specified Causes Of Loss Coverage**

Caused by:

**(1)** Fire, lightning or explosion;

**(2)** Theft;

**(3)** Windstorm, hail or earthquake;

**(4)** Flood;

**(5)** Mischief or vandalism; or

**(6)** The sinking, burning, collision or derailment of any conveyance transporting the "trailer".

**c. Collision Coverage**

Caused by:

**(1)** The "trailer's" collision with another object; or

**(2)** The "trailer's" overturn.

   © Insurance Services Office, Inc., 2011

**2.** We have the right and duty to defend any "insured" against a "suit" asking for these damages. However, we have no duty to defend any "insured" against a "suit" seeking damages for any "loss" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends for a coverage when the Limit of Insurance for that coverage has been exhausted by payment of judgments or settlements.

**3. Coverage Extensions**

The following apply as **Supplementary Payments.** We will pay for you:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance.

**c.** All reasonable expenses incurred at our request, including actual loss of earnings up to $250 a day because of time off from work.

**d.** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**e.** All interest on the full amount of any judgment that accrues after entry of the judgment; but our duty to pay interest ends when we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**B. Exclusions**

**1.** We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

**a. Nuclear Hazard**

**(1)** The explosion of any weapon employing atomic fission or fusion; or

**(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

**b. War Or Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for loss of use.

**3. Other Exclusions**

We will not pay for "loss" due and confined to:

**a.** Wear and tear, freezing, mechanical or electrical breakdown.

**b.** Blowouts, punctures or other road damage to tires.

This exclusion does not apply to such "loss" resulting from the total theft of a covered "auto".

**C. Limits Of Insurance**

The most we will pay for "loss" to any one "trailer" is the least of the following amounts:

**1.** The actual cash value of the damaged or stolen property at the time of the "loss";

**2.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality; or

**3.** The Limit Of Insurance shown in the Declarations.

**D. Deductible**

For each covered "trailer", our obligation to pay:

**1.** The actual cash value of the damaged or stolen property at the time of the "loss" will be reduced by the applicable deductible shown in the Declarations.

**2.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality will be reduced by the applicable deductible shown in the Declarations.

**3.** The damages for "loss" that would otherwise be payable will be reduced by the applicable deductible shown in the Declarations prior to the application of the Limit Of Insurance shown in the Declarations.

**SECTION IV – PHYSICAL DAMAGE COVERAGE**

**A. Coverage**

**1.** We will pay for "loss" to a covered "auto" or its equipment under:

    **a. Comprehensive Coverage**

      From any cause except:

      **(1)** The covered "auto's" collision with another object; or

      **(2)** The covered "auto's" overturn.

    **b. Specified Causes Of Loss Coverage**

      Caused by:

      **(1)** Fire, lightning or explosion;

      **(2)** Theft;

      **(3)** Windstorm, hail or earthquake;

      **(4)** Flood;

      **(5)** Mischief or vandalism; or

      **(6)** The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

    **c. Collision Coverage**

      Caused by:

      **(1)** The covered "auto's" collision with another object; or

      **(2)** The covered "auto's" overturn.

**2. Towing – Private Passenger Type Autos**

We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the "private passenger type" is disabled. However, the labor must be performed at the place of disablement.

**3. Glass Breakage – Hitting A Bird Or Animal – Falling Objects Or Missiles**

If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

    **a.** Glass breakage;

    **b.** "Loss" caused by hitting a bird or animal; and

    **c.** "Loss" caused by falling objects or missiles.

However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

**4. Coverage Extension**

    **a. Transportation Expenses**

      We will also pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the "private passenger type". We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes Of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

    **b. Loss Of Use Expenses**

      For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver, under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

      **(1)** Other than collision only if the Declarations indicates that Comprehensive Coverage is provided for any covered "auto";

      **(2)** Specified Causes Of Loss only if the Declarations indicates that Specified Causes Of Loss Coverage is provided for any covered "auto"; or

      **(3)** Collision only if the Declarations indicates that Collision Coverage is provided for any covered "auto".

      However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

**B. Exclusions**

**1.** We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

    **a. Nuclear Hazard**

      **(1)** The explosion of any weapon employing atomic fission or fusion; or

      **(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

 © Insurance Services Office, Inc., 2011 CA 00 20 10 13

**b. War Or Military Action**

    **(1)** War, including undeclared or civil war;

    **(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    **(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for "loss" to any of the following:

    **a.** Any covered "auto" while in anyone else's possession under a written "trailer" interchange agreement. But this exclusion does not apply to a loss payee; however, if we pay the loss payee, you must reimburse us for our payment.

    **b.** Any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

    **c.** Tapes, records, discs or similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

    **d.** Any device designed or used to detect speed-measuring equipment, such as radar or laser detectors, and any jamming apparatus intended to elude or disrupt speed-measuring equipment.

    **e.** Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

    **f.** Any accessories used with the electronic equipment described in Paragraph **e.** above.

**3.** Exclusions **2.e.** and **2.f.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:

    **a.** Permanently installed in or upon the covered "auto";

    **b.** Removable from a housing unit which is permanently installed in or upon the covered "auto";

    **c.** An integral part of the same unit housing any electronic equipment described in Paragraphs **a.** and **b.** above; or

    **d.** Necessary for the normal operation of the "auto" or the monitoring of the "auto's" operating system.

**4.** We will not pay for "loss" due and confined to:

    **a.** Wear and tear, freezing, mechanical or electrical breakdown.

    **b.** Blowouts, punctures or other road damage to tires.

    This exclusion does not apply to "loss" resulting from the total theft of a covered "auto".

**5.** We will not pay for "loss" to a covered "auto" due to "diminution in value".

**C. Limits Of Insurance**

**1.** The most we will pay for:

    **a.** "Loss" to any one covered "auto" is the lesser of:

        **(1)** The actual cash value of the damaged or stolen property as of the time of the "loss"; or

        **(2)** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

    **b.** All electronic equipment that reproduces, receives or transmits audio, visual or data signals in any one "loss" is $1,000, if, at the time of "loss", such electronic equipment is:

        **(1)** Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

        **(2)** Removable from a permanently installed housing unit as described in Paragraph **b.(1)** above; or

        **(3)** An integral part of such equipment as described in Paragraphs **b.(1)** and **b.(2)** above.

**2.** An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

**3.** If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

**D. Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

**SECTION V – MOTOR CARRIER CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

**1. Appraisal For Physical Damage Loss**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Accident, Claim, Suit Or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

**(1)** How, when and where the "accident" or "loss" occurred;

**(2)** The "insured's" name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**(4)** Authorize us to obtain medical records or other pertinent information.

**(5)** Submit to examination at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is a "loss" to a covered "auto" or its equipment, you must also do the following:

**(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

**(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

**(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

**(4)** Agree to examination under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** Under Covered Autos Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4. Loss Payment – Physical Damage Coverages**

At our option, we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

© Insurance Services Office, Inc., 2011

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B. General Conditions**

**1. Bankruptcy**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligation under this Coverage Form.

**2. Concealment, Misrepresentation Or Fraud**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceals or misrepresents a material fact concerning:

**a.** This Coverage Form;

**b.** The covered "auto";

**c.** Your interest in the covered "auto"; or

**d.** A claim under this Coverage Form.

**3. Liberalization**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit To Bailee – Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

**5. Other Insurance – Primary And Excess Insurance Provisions**

**a.** While any covered "auto" is hired or borrowed from you by another "motor carrier", this Coverage Form's Covered Autos Liability Coverage is:

**(1)** Primary if a written agreement between you as the lessor and the other "motor carrier" as the lessee requires you to hold the lessee harmless.

**(2)** Excess over any other collectible insurance if a written agreement between you as the lessor and the other "motor carrier" as the lessee does not require you to hold the lessee harmless.

**b.** While any covered "auto" is hired or borrowed by you from another "motor carrier", this Coverage Form's Covered Autos Liability Coverage is:

**(1)** Primary if a written agreement between the other "motor carrier" as the lessor and you as the lessee does not require the lessor to hold you harmless, and then only while the covered "auto" is used exclusively in your business as a "motor carrier" for hire.

**(2)** Excess over any other collectible insurance if a written agreement between the other "motor carrier" as the lessor and you as the lessee requires the lessor to hold you harmless.

**c.** While a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Covered Autos Liability Coverage is:

**(1)** Provided on the same basis, either primary or excess, as the Covered Autos Liability Coverage provided for the power unit if the power unit is a covered "auto".

**(2)** Excess if the power unit is not a covered "auto".

**d.** Any Trailer Interchange Coverage provided by this Coverage Form is primary for any covered "auto".

**e.** Except as provided in Paragraphs **a., b., c.** and **d.** above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

**f.** For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

**g.** Regardless of the provisions of Paragraphs **a., b., c., d.** and **e.** above, this Coverage Form's Covered Autos Liability Coverage is primary for any liability assumed under an "insured contract".

**h.** When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6. Premium Audit**

**a.** The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

**b.** If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

Under this Coverage Form, we cover "accidents" and "losses" occurring:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

The coverage territory is:

**(1)** The United States of America;

**(2)** The territories and possessions of the United States of America;

**(3)** Puerto Rico;

**(4)** Canada; and

**(5)** Anywhere in the world if a covered "auto" of the "private passenger type" is leased, hired, rented or borrowed without a driver for a period of 30 days or less,

provided that the "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico or Canada, or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. Two Or More Coverage Forms Or Policies Issued By Us**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

**SECTION VI – DEFINITIONS**

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means:

**1.** A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or

**2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 © Insurance Services Office, Inc., 2011

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

   **(1)** Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

   **(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

   **(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

   **(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

   **(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraph **6.b.** or **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto", if:

   **(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

   **(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract" means:

   **1.** A lease of premises;

   **2.** A sidetrack agreement;

   **3.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **4.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **5.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement; or

   **6.** That part of any other contract or agreement, entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

An "insured contract" does not include that part of any contract or agreement:

**a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**b.** That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

**c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" unless the covered "auto" is used in your business as a "motor carrier" for hire as in Section **II**, Paragraph **A.1.d.** of the Who Is An Insured provision.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

**K.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**1.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**2.** Vehicles maintained for use solely on or next to premises you own or rent;

**3.** Vehicles that travel on crawler treads;

**4.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**a.** Power cranes, shovels, loaders, diggers or drills; or

**b.** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**5.** Vehicles not described in Paragraph **1., 2., 3.** or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

**b.** Cherry pickers and similar devices used to raise or lower workers; or

**6.** Vehicles not described in Paragraph **1., 2., 3.** or **4.** above, maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**a.** Equipment designed primarily for:

**(1)** Snow removal;

**(2)** Road maintenance, but not construction or resurfacing; or

**(3)** Street cleaning;

**b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**c.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well-servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**L.** "Motor carrier" means a person or organization providing transportation by "auto" in the furtherance of a commercial enterprise.

**M.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**N.** "Private passenger type" means a private passenger or station wagon type "auto" and includes an "auto" of the pickup or van type if not used for business purposes.

**O.** "Property damage" means damage to or loss of use of tangible property.

**P.** "Suit" means a civil proceeding in which:

**1.** Damages because of "bodily injury" or "property damage"; or

**2.** A "covered pollution cost or expense",

to which this insurance applies, are alleged.

"Suit" includes:

    **a.** An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" submits with our consent.

**Q.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**R.** "Trailer" includes a semitrailer or a dolly used to convert a semitrailer into a trailer. But for Trailer Interchange Coverage only, "trailer" also includes a container.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc.,  1998

□

COMMERCIAL AUTO                                    CHI – 370 (05/19)

# CountyHall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION OF NON-SCHEDULED DRIVERS

This endorsement modifies insurance provided under the following:
**MOTOR CARRIER COVERAGE FORM**

It is hereby understood and agreed that the following exclusion is added to the policy:

| SCHEDULE OF COVERED DRIVERS | | | | | |
|---|---|---|---|---|---|
| **NAME** | **DOB** | **STATE** | **LICENSE #** | **YEARS OF CLASS A EXP.** | **DATE OF HIRE** |
| ROLANDO MONTEAGUDO PEREZ | 08/27/1960 | AZ | D10014131 | 5 | 06/25/2023 |

**A.** This insurance does not apply to liability or damages for "bodily injury" or "property damage" arising out of:

  **1.** 1.  The ownership, maintenance or use of any "auto" by anyone other than the individuals shown in the Schedule of Covered Drivers above, whether or not such ownership, maintenance or use was with the express or implied permission of any "insured" or the owner of the "auto"; or

  **2.** Any negligence which may be imputed to any "insured" by law arising out of the ownership, maintenance or use of any "auto" by anyone other than the individuals shown in the Schedule of Covered Drivers above, including any claims against any "insured" for negligent hiring, negligent retention or negligent entrustment.

**B.** If this exclusion is invalid or unenforceable in the state or territory where an "accident" occurs because of a state or federal financial responsibility law, we will provide the minimum Limit of Liability necessary to comply with such law. However, we have the right to seek reimbursement from you for any amounts we pay as a result of damages otherwise excluded under this endorsement.

**All Other Terms and Conditions of the Policy Remain Unchanged**

**COMMERCIAL AUTO**                                                                                      **CA 23 01 10 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXPLOSIVES

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**Covered Autos Liability Coverage** is changed by adding the following exclusion:

This insurance does not apply to:

"Bodily injury" or "property damage" caused by the explosion of explosives you make, sell or transport.

**© ISO Properties, Inc.**

**COMMERCIAL AUTO**                                                    **CA 23 05 10 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WRONG DELIVERY OF LIQUID PRODUCTS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**Covered Autos Liability Coverage** is changed by adding the following exclusion:

This insurance does not apply to:

"Bodily injury" or "property damage" resulting from the delivery of any liquid into the wrong receptacle or to the wrong address, or from the delivery of one liquid for another, if the "bodily injury" or "property damage" occurs after delivery has been completed.

Delivery is considered completed even if further service or maintenance work, or correction, repair or replacement is required because of wrong delivery.

**© ISO Properties, Inc.**

**COMMERCIAL AUTO**                                                      **CA 23 94 03 06**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION FOR COVERED AUTOS EXPOSURE

This endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM**
**GARAGE COVERAGE FORM**
**MOTOR CARRIER COVERAGE FORM**
**TRUCKERS COVERAGE FORM**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

A. The following exclusion is added to Paragraph B. Exclusions of Section II – Liability Coverage in the Business Auto, Motor Carrier and Truckers Coverage Forms and for "Garage Operations" – Covered "Autos" in the Garage Coverage Form:

**SILICA OR SILICA-RELATED DUST EXCLUSION FOR COVERED AUTOS EXPOSURE**

This insurance does not apply to:

1. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

2. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

3. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any "insured" or by any other person or entity.

**B. Additional Definitions**

As used in this endorsement:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

**© ISO Properties, Inc.**

**COMMERCIAL AUTO**                                              **IL 00 21 09 08**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

      COMMERCIAL AUTOMOBILE COVERAGE PART
      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      FARM COVERAGE PART
      LIQUOR LIABILITY COVERAGE PART
      MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
      OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
      POLLUTION LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      RAILROAD PROTECTIVE LIABILITY COVERAGE PART
      UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

  **A.** Under any Liability Coverage, to "bodily injury" or "property damage":

    **(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

  **B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

  **C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

    **(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

    **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**© ISO Properties, Inc.**

**COMMERCIAL AUTO**                                                        **IL 09 13 04 98**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# INSURANCE INSPECTION SERVICES
# EXEMPTION FROM LIABILITY

# THE FOLLOWING LIMITS OUR LIABILITY

We, the insurance company, our agents, employees, or service contractors, are not liable for damages from injury, death or loss occurring as a result of any act or omission in the furnishing of or the failure to furnish insurance inspection services related to, in connection with or incidental to the issuance or renewal of a policy of property or casualty insurance.

This exemption from liability does not apply:

A. If the injury, loss or death occurred during the actual performance of inspection services and was proximately caused by our negligence, or by the negligence of our agents, employees or service contractors;

B. To any inspection services required to be performed under the provisions of a written service contract or defined loss prevention program;

C. In any action against us, our agents, employees, or service contractors for damages proximately caused by our acts or omissions which are determined to constitute a crime, actual malice or gross negligence; or

D. If we fail to provide this written notice to the insured whenever the policy is issued or when new policy forms are issued upon renewal.

**© ISO Properties, Inc.**

**COMMERCIAL AUTO**                                                      **CHI - 210 (05/18)**

**COUNTY HALL INSURANCE COMPANY, INC., A RISK RETENTION GROUP**
**401 Hawthorne Lane, Suite 110 #226, Charlotte, NC 28204**

# PUNITIVE DAMAGES EXCLUSION ENDORSEMENT
# (Liability Coverages)

This endorsement, effective on the Effective Date shown on the Master Policy Declarations herein, forms a part of this Master Policy issued to the Named Insured shown on the Master Policy Declarations herein by County Hall Insurance Company, Inc., a Risk Retention Group

_____ _(signature)_ _____
Authorized Representative

It is hereby agreed and understood, in consideration of the premium charged that damages, costs, and expenses covered under the insuring agreements exclude punitive and/or exemplary damages.

The insuring agreements are limited to compensatory damages resulting strictly from liability for coverages as defined, except that if a suit shall have been brought against you with respect to the claim for alleged acts falling within the coverages hereof, seeking both compensatory and punitive or exemplary damages, then we will afford a defense to such action. However, we will not indemnify you or any other insured for any award of punitive and exemplary damages.

Nothing herein contained shall be held to waive, alter or extend any of the declarations, agreements, conditions, or terms of the aforementioned Policy other than as above stated.

**COMMERCIAL AUTO**                                                                                          **CHI – 240 (12/18)**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane, Suite 110 #226
Charlotte, NC 28204

## MEMBERSHIP NOTIFICATION

As required by County Hall Insurance Company, Inc., a Risk Retention Group ("CHIRRG") domiciliary regulator, the North Carolina Division of Insurance, the Board of Directors have adopted the County Hall Insurance Company, Inc., a Risk Retention Group Governance Standards. Members can request a copy of the Governance Standards by sending a written request to Members@countyhallinsurance.com.

As require by County Hall Insurance Company, Inc., a Risk Retention Group ("CHIRRG")'s domiciliary regulator, the North Carolina Division of Insurance, the Board of Directors have adopted the County Hall Insurance Company, Inc., a Risk Retention Group Code of Business Conduct and Ethics. Members can request a copy of the Code of Business Conduct and Ethics by sending a written request to Members@countyhallinsurance.com.

**COMMERCIAL AUTO**                                                          **CHI – 280 (12/18)**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane, Suite 110 #226
Charlotte, NC 28204

## OFFERING MEMORANDUM

The Company has been organized and incorporated as a captive insurance, risk retention group company under the laws of the State of North Carolina for the purpose of insuring certain risks of its member-insureds with respect to commercial auto (trucking) liability.   As required under the Federal Risk Retention Act all insureds of the Company must also be members of County Hall  Holdings, LLC (Holdings), accordingly each insured will purchase one Class B membership unit in Holdings.  Members can request a copy of the Private Placement Memorandum of Holdings (Memorandum) by sending a written request to Members@countyhallinsurance.com.  It is highly recommended that the Memorandum be reviewed prior to becoming a member of Holdings and an insured of the Company.

**COMMERCIAL AUTO**                                      **CHI – 100 (09/20)**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane, Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

AMENDED AND RESTATED OPERATING AGREEMENT FOR

COUNTY HALL HOLDINGS, LLC

A NORTH CAROLINA LIMITED LIABILITY COMPANY

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933 OR THE NORTH CAROLINA UNIFORM SECURITIES ACT OR REGISTERED OR
QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR
SALE, SOLD, DELIVERED AFTER THE SALE, TRANSFERRED, UNLESS QUALIFIED AND REGISTERED
UNDER THE APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF
COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT
REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER
SUBJECT TO THE OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

## TABLE OF CONTENTS
### (CONTINUED)

**Page**

ARTICLE I: DEFINITIONS ..................................................................................................................................1

ARTICLE II: ORGANIZATION...........................................................................................................................3

2.1   FORMATION.                                                                                  3
2.2   NAME.                                                                                        3
2.3   TERM.                                                                                        3
2.4   OFFICE AND AGENT.                                                                           4
2.5   NAMES AND ADDRESSES OF THE MEMBERS.                                                         4
2.6   PURPOSE; POWERS.                                                                            4

ARTICLE III: CAPITAL CONTRIBUTIONS .........................................................................................................4

3.1   CLASS A (VOTING) MEMBER CAPITAL CONTRIBUTIONS.                                               4
3.2   CLASS B (NON-VOTING) MEMBER CAPITAL CONTRIBUTIONS.                                           4
3.3   CAPITAL ACCOUNTS.                                                                           4
3.4   NO RIGHTS OF REDEMPTION OR RETURN OF CAPITAL CONTRIBUTION.                                  5

ARTICLE IV: MEMBERS ....................................................................................................................................5

4.1   LIMITED LIABILITY.                                                                          5
4.2   ADMISSION OF ADDITIONAL MEMBERS.                                                            5
4.3   WITHDRAWALS, RESIGNATIONS OR TERMINATIONS.                                                  5
4.4   TRANSACTIONS BETWEEN THE COMPANY AND THE MEMBERS.                                           5

ARTICLE V: MANAGEMENT AND CONTROL OF COMPANY..............................................................................5

5.1   MANAGEMENT OF THE COMPANY ONLY BY THE CLASS A (VOTING) MEMBER.                             5
5.2   OFFICERS.                                                                                   6
5.3   DEVOTION OF TIME.                                                                           7
5.4   PAYMENTS TO THE MEMBER.                                                                     7

ARTICLE VI: MEETINGS.....................................................................................................................................7

6.1   MEETINGS OF THE CLASS A (VOTING) MEMBER.                                                    7
6.2   NOTICE OF MEETING OR PROXY.                                                                 7
6.3   MEETINGS BY CONFERENCE TELEPHONE OR OTHER MEANS.                                            7
6.4   PROXY.                                                                                      7
6.5   ACTION WITHOUT A MEETING.                                                                   8

ARTICLE VII: DISTRIBUTIONS ...........................................................................................................................8

7.1   DISTRIBUTIONS OF DISTRIBUTABLE CASH BY THE COMPANY.                                         8
7.2   RESTRICTION ON DISTRIBUTIONS.                                                               8

ARTICLE VIII: TRANSFER AND ASSIGNMENT OF INTERESTS ...........................................................................8

8.1   TRANSFER AND ASSIGNMENT OF INTERESTS.                                                       8

TABLE OF CONTENTS

(CONTINUED)

| | | Page |
|---|---|---|
| 8.2 | FURTHER RESTRICTIONS ON TRANSFER OF INTERESTS. | 8 |
| 8.3 | SUBSTITUTED MEMBERS. | 8 |
| 8.4 | EFFECTIVE DATE OF PERMITTED TRANSFERS. | 9 |

ARTICLE IX: ACCOUNTING, RECORDS, REPORTING BY MEMBERS .................................................9

| 9.1 | BOOKS AND RECORDS. | 9 |
|---|---|---|
| 9.2 | TAX INFORMATION. | 9 |
| 9.3 | BANK ACCOUNTS. | 9 |
| 9.4 | ACCOUNTING DECISIONS AND RELIANCE ON OTHERS. | 9 |
| 9.5 | TAX MATTERS FOR THE COMPANY. | 9 |

ARTICLE X: DISSOLUTION AND WINDING UP...............................................................................10

| 10.1 | DISSOLUTION. | 10 |
|---|---|---|
| 10.2 | WINDING UP. | 10 |
| 10.3 | ORDER OF PAYMENT UPON DISSOLUTION. | 10 |
| 10.4 | LIMITATIONS ON PAYMENTS MADE IN DISSOLUTION. | 10 |

ARTICLE XI: INDEMNIFICATION AND INSURANCE .......................................................................10

| 11.1 | DEFINITIONS. | 10 |
|---|---|---|
| 11.2 | INDEMNIFICATION. | 11 |
| 11.3 | INSURANCE. | 11 |
| 11.4 | DETERMINATION OF CONDUCT. | 11 |
| 11.5 | LIMITATIONS ON INDEMNIFICATION. | 11 |

ARTICLE XII: MISCELLANEOUS ....................................................................................................11

| 12.1 | COUNSEL TO THE COMPANY. | 12 |
|---|---|---|
| 12.2 | COMPLETE AGREEMENT. | 12 |
| 12.3 | BINDING EFFECT. | 12 |
| 12.4 | PARTIES IN INTEREST. | 12 |
| 12.5 | PRONOUNS; STATUTORY REFERENCES. | 12 |
| 12.6 | HEADINGS. | 12 |
| 12.7 | JURISDICTION. | 12 |
| 12.8 | EXHIBITS. | 12 |
| 12.9 | SEVERABILITY. | 12 |
| 12.10 | NOTICES. | 12 |
| 12.11 | AMENDMENTS. | 13 |
| 12.12 | RELIANCE ON AUTHORITY OF PERSON SIGNING AGREEMENT. | 13 |
| 12.13 | TIME IS OF THE ESSENCE. | 13 |
| 12.14 | GOVERNING LAW. | 13 |

Exhibit A

OPERATING AGREEMENT FOR

COUNTY HALL HOLDINGS, LLC

A NORTH CAROLINA LIMITED LIABILITY COMPANY


THIS OPERATING AGREEMENT is made as of **May 1**, 2017, but shall be effective as of the Effective Date, by County Hall Holdings, LLC, a North Carolina limited liability company (the "Company") and the entities or persons listed on Exhibit A, as Members, with reference to the following facts:

A.       Effective December **30**, 2016, the Articles of Organization for the Company, a limited liability company organized under the North Carolina Limited Liability Company Act, North Carolina General Statutes, Chapter 57D, were filed with the Secretary of State of the State of North Carolina.

B.       The aforesaid Members desire to adopt and approve an operating agreement for the Company.

NOW, THEREFORE, the Members, for and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree to the terms and conditions of this Agreement, as it may from time to time be amended.

## ARTICLE I: DEFINITIONS

Unless otherwise defined in this Agreement, the following terms shall have the meanings set forth below:

"Act" means the North Carolina Limited Liability Company Act, North Carolina General Statutes Chapter 57D, as amended from time to time (or any corresponding provisions of any succeeding law).

"Additional Capital Contribution" means, for each Member, any Capital Contribution made by such Member under Section 3.2.

"Affiliate" means, for any Person:

(1)       Any Person directly or indirectly controlling, controlled by, or under common control with such Person;

(2)       Any officer, director, general partner, member, or trustee of such Person; or

(3)       Any Person who is an officer, director, general partner, member, or trustee of any Person described in paragraphs (1) or (2).

For purposes of this definition, the terms "controlling", "controlled by", or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least fifty percent (50%) of the directors, managers, general partners, or Persons exercising similar authority concerning such Person.

"Agreement" or "Operating Agreement" means this Operating Agreement, including all Exhibits attached hereto, as amended from time to time.

"Articles" means the Company's Articles of Organization filed with the Department, as originally executed and amended, modified, supplemented or restated from time to time, as the context requires.

"Articles of Termination" mean the Articles of Termination filed in accordance with HRS §428-805 and as that term is otherwise used and referred to in the Act.

"Assignee" means the owner of an Economic Interest who has not been admitted as a Substituted Member in accordance with Article VIII.

"Bankruptcy" means:

(1)       The filing of an application by a Member for, or its consent to, the appointment of a trustee, receiver, or custodian of its other assets;

(2)       The entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time;

(3)       The making by a Member of a general assignment for the benefit of creditors;

(4)       The entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member, unless the proceedings and the person appointed are dismissed within ninety (90) days; or

(5)       The failure by a Member generally to pay its debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of its inability to pay its debts as they become due.

"Business" means the business of captive insurance, and any other activity related or ancillary thereto, and any other lawful activity for which a limited liability company may be organized under the Act.

"Capital Account" means the Capital Account that the Company establishes and maintains for each Member as set forth in Section 3.2.

"Capital Contribution" means the total amount of cash and the fair market value of property contributed to the Company by a Member with respect to the Membership Interest in the Company held by the Member, including any Additional Capital Contribution.

 "Company" means the limited liability company formed under the Articles and this Agreement.

"Department" means the Department of the Secretary of State of the State of North Carolina, or any successor agency.

"Dissolution Event" means one or more of the following: the death, insanity, withdrawal, resignation, retirement, expulsion, Bankruptcy, or dissolution of Class A (voting) Member.

"Distributable Cash" means the amount of cash that Class A (voting) Member deems available for distribution to the Class A (voting) Member, taking into account all debts, liabilities, and obligations of the Company then due, minimum capital and surplus requirements of the Company, and working capital and other amounts that the Class A (voting) Member deems necessary for the Company's Business or to place into reserves for customary and usual claims with respect to the Business.

"Economic Interest" means the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit, and similar items from the Company under this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or except as provided in HRS §428-408, any right to information concerning the Business and affairs of the Company.

"Effective Date" means the date on which the Articles, as filed with the Office of the Director of the Department under HRS §428-202, take effect.

"Fiscal Year" means the Company's fiscal year, which shall be the calendar year or any shorter period ending on December 31.

"Member" means each Person who:

(1)　　Is a signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles or this Agreement, or is an Assignee who has become a Member in accordance with Article VIII;

(2)　　Has not become the subject of a Dissolution Event or ceased to be a Member for any other reason under the provisions of this Agreement; and

(3)　　Is insured under a policy of insurance issued by County Hall Insurance Company, Inc., A Risk Retention Group ("RRG").

"Membership Interest" means a Member's entire interest in the Company including, if applicable, the Member's Economic Interest, the right to vote on or participate in the management of the Company, and the right to receive information concerning the Business and affairs of the Company.

"Percentage Interest" means the percentage of a Member set forth opposite the Member's name in Exhibit A hereto, as such percentage may be adjusted from time to time under the terms of this Agreement.

"Person" means an individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee, or any other entity.

"Substituted Member" means an Assignee of a Membership Interest meeting the requirements of Section 8.3

"Transfer" means, as a noun, any voluntary or involuntary transfer, assignment, sale, conveyance, lease, mortgage, security interest, deed, encumbrance, gift, pledge, hypothecation, or other disposition; and, as a verb, voluntarily or involuntarily to transfer, assign, sell, convey, lease, mortgage, grant a security interest in, deed, encumber give, pledge, hypothecate, or otherwise dispose of.

## ARTICLE II: ORGANIZATION

### 2.1　FORMATION.

(a)　　The Company was formed under the Act by filing the Articles with the Department and entering into this Agreement, which is deemed effective as of the Effective Date.

(b)　　Except to the extent that a provision of this Agreement is expressly prohibited or ineffective under the Act, this Agreement shall govern even when inconsistent with or different from the provisions of the Act or any other law or rule.  The Members shall be entitled to rely on the provisions of this Agreement, and shall not be liable to the Company (or to any other Member) for any action or refusal to act taken in good faith reliance on the terms of this Agreement.  The Members and the Company hereby agree that the duties and obligations imposed upon the Members of the Company, as such, shall be those set forth in this Agreement, which is intended to govern the relationship between the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

### 2.2　NAME.

The name of the Company shall be "County Hall Holdings, LLC".  The Business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Class A (voting) Member deems appropriate or advisable.

### 2.3　TERM.

The term of this Agreement commenced on the Effective Date and shall continue until the Company is dissolved and its Business and affairs wound up in accordance with the Act and this Agreement.  The existence of the Company as a separate legal entity shall continue until the filing or effective date of the Company's Articles of Termination.

2.4     OFFICE AND AGENT.

        (a)     General.  The Company shall continuously maintain an office and registered agent in the State of North Carolina.

        (b)     Office.  The principal office of the Company shall be at 401 Hawthorne Lane, Suite 110 #226, Charlotte, NC 28204.

        (c)     Designated Agent for Service of Process.  The registered agent for service of process on the Company in the State of North Carolina shall be Company will be Corporation Service Company, with a business address at 327 Hillsborough Street, Raleigh, NC 27603.  If the designated agent for service of process ceases to act as such for any reason, then a replacement registered agent for service of process shall be designated and appointed.

2.5     NAMES AND ADDRESSES OF THE MEMBERS.

        The names and addresses of the Members are set forth in Exhibit A.  The Members may change their addresses upon written notice thereof to the Company.

2.6     PURPOSE; POWERS.

        The primary purpose for which this Company is formed is to be the sole shareholder of the RRG in compliance with the applicable provisions of the Federal Liability Risk Retention Act of 1986, as amended (15 USC § 3901) et seq.  In addition, the Company is authorized to do and transact any and every other kind of business that is permitted under the Act as now in force or as hereafter amended, and to transact any other lawful business for which limited liability companies may be organized under Chapter 428, HRS, as amended, in its limited liability company capacity, in a partnership status, as part of a joint venture, or in any other capacity.  The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental, or convenient to, or in furtherance of, the purposes of the Company set forth in this Section 2.6.

ARTICLE III: CAPITAL CONTRIBUTIONS

3.1     CLASS A (VOTING) MEMBER CAPITAL CONTRIBUTIONS.

        The Class A (voting) Member has or will contribute $1,000,000 as and for its initial capital contribution in exchange for its sole interest as the Class A (voting) Member of the Company.

3.2     CLASS B (NON-VOTING) MEMBER CAPITAL CONTRIBUTIONS.

        Class B (non-voting) Members shall each annually contribute capital to the Company in amounts determined by the Company.  For the first year in which a Class B (non-voting) Member is a member of the Company, said Class B (non-voting) Member's required capital contribution shall be equal to the sum of the cost for said member's one (1) Class B (non-voting) Membership Unit, plus such additional paid-in capital as determined by the Company.   Annually, and for each year thereafter, a Class B (non-voting) Member shall contribute additional paid-in capital to the Company in amounts determined by the Company from time to time.

3.3     CAPITAL ACCOUNTS.

        The Company shall establish and maintain individual Capital Accounts for the Members.  If a Member makes a permitted Transfer of all or a part of the Member's Membership Interest in accordance with this Agreement, the Member's Capital Account attributable to the Transferred Membership Interest shall carry over to the new owner of such Membership Interest.

3.4     NO RIGHTS OF REDEMPTION OR RETURN OF CAPITAL CONTRIBUTION.

Members shall not have any right to have their Membership Interests redeemed or to have their Capital Contributions returned before the termination of the Company, even if a Member dissociates pursuant to HRS §428-601, before the termination of the Company.  At the termination of the Company, only the Class A (voting) Member shall have any rights to redemption, return of capital or any right to amounts distributable in dissolution.


ARTICLE IV: MEMBERS

4.1     LIMITED LIABILITY.

Except as expressly set forth in this Agreement or required by law, the Members shall not be liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2     ADMISSION OF ADDITIONAL MEMBERS.

(a)      In General.  The Class A (voting) Member, in its sole discretion, may admit additional Members to the Company.  Any additional Member shall make Capital Contributions as required herein and after doing so, shall obtain therefor a Membership Interest in the Company, subject to the provisions hereof.

(b)      Amendment and Restatement of this Agreement.  If additional Members are admitted, this Agreement may be amended and restated as necessary to specify the rights and requirements of the Members to apply from the date of admission, and to make any other changes that are necessary or desirable in connection with such admission.

4.3     WITHDRAWALS, RESIGNATIONS OR TERMINATIONS.

A Member shall cease to be a Member of the Company when it ceases to be an insured of the RRG and vice versa.  Members may also withdraw, resign or may be terminated as a Member of the Company for, among other things, failure to adhere to the provisions of this Agreement, in which case they will also automatically cease to qualify for insurance coverage from the RRG.

4.4     TRANSACTIONS BETWEEN THE COMPANY AND THE MEMBERS.

Although it may constitute a conflict of interest, the Members may, and may cause its Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company as long as:

(1)      Such transaction is not expressly prohibited by this Agreement; and

(2)      The terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length.


ARTICLE V: MANAGEMENT AND CONTROL OF COMPANY

5.1     MANAGEMENT OF THE COMPANY ONLY BY THE CLASS A (VOTING) MEMBER.

The Class A (voting) Member, unless otherwise required in this Agreement or by the Act, shall be responsible for the management of the Business, property, and affairs of the Company, and shall have the full and complete authority, power, and discretion to:

**COMMERCIAL AUTO**                                                            **CHI – 100 (09/20)**

(1)       Manage and control the Business, property, and affairs of the Company;

(2)       Make all decisions regarding those matters; and

(3)       Perform any and all other acts or activities customary or incident to the management of the Company's Business, property, and affairs.

Class B (non-voting) Members have no voting rights or any right to participate in the management of the Company.

5.2     OFFICERS.

(a)       Appointment.  The Class A (voting) Member may elect such officers at such times as the Class A (voting) Member so desires.  The Company's officers, if any, shall report to the Class A (voting) Member.

(b)       Removal or Resignation.  Any officer may be removed by the Class A (voting) Member whenever, in its judgment, the best interest of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  An officer may resign at any time by giving written notice to the Class A (voting) Member.  A resignation is effective when the notice is delivered, unless the notice specifies a later date.  If a resignation is made effective at a later date and the Class A (voting) Member accepts the future effective date, the Class A (voting) Member may fill the pending vacancy before the effective date if the Class A (voting) Member provides that the successor does not take office until the effective date.

(c)       Compensation.  The Class A (voting) Member may compensate the officers of the Company for their services as such.

(d)       President.  The President, if any, shall have the general powers and duties of management usually vested in the office of the president of a company, and shall have such other powers and duties as may be prescribed by the Class A (voting) Member.

(e)       Vice-President(s).  In the absence, disability, or by delegation of the President, a Vice-President, if any, shall perform the duties and exercise the powers of the President, and shall perform such other duties, as the Class A (voting) Member shall prescribe.  If there is more than one Vice-President, the Class A (voting) Member shall determine which Vice-President shall perform the duties and exercise the powers of the President in the absence or disability of said President.

(f)       Secretary.  The Secretary, if any, shall prepare and be responsible for the custody of minutes of the Member's meetings and for authenticating records of the Company.  In this regard, the Secretary shall keep, or cause to be kept, a book of minutes, at the principal office or such other place as the Class A (voting) Member may order, of all meetings of the Class A (voting) Member, with the time and place of holding, the names of those present, and the membership units represented at the Class A (voting) Member meetings and proceedings thereof.  The Secretary shall also keep, or cause to be kept, a register of membership units showing the names of Members, addresses of Members, the number of membership units held, the number and date of certificates issued if applicable, and the number and date of cancellation of every certificate surrendered for cancellation.  The Secretary shall give, or cause to be given, notice of all Class A (voting) Member meetings required to be given.  In the absence or disability of the Secretary, any other officer of the Company may provide such notice.

(g)       Treasurer.  The Treasurer, if any, shall be the financial and accounting officer of the Company.  The Treasurer shall receive and keep all of the funds of the Company, and shall pay them out only upon checks or drafts of the Company, signed in the manner authorized by the Class A (voting) Member.

(h)       Assistants.  Assistant Secretary(ies) or Assistant Treasurer(s), if any, may respectively exercise any of the powers conferred upon the Secretary or Treasurer as directed by the Class A (voting) Member.

5.3      DEVOTION OF TIME.

The Class A (voting) Member is not obligated to devote all of its time or business efforts to the affairs of the Company, but shall devote whatever time, effort and skill that it deems reasonably necessary or appropriate for the operation of the Company.

5.4      PAYMENTS TO THE MEMBER.

The Class A (voting) Member or its Affiliates may receive remuneration for services rendered or goods provided to the Company, including the following payments:

(1)      Services Performed by the Class A (voting) Member or its Affiliates.   The Company may pay the Class A (voting) Member or any Affiliate for services rendered or goods provided to the Company at such rates that the Class A (voting) Member may determine from time to time.

(2)      Expenses.   The Company may pay or reimburse the Class A (voting) Member or any Affiliate for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare and file the Articles and this Agreement and for any other expenses reasonably incurred in the conduct of the Business that have been approved in advance by the Class A (voting) Member.

## ARTICLE VI: MEETINGS

6.1      MEETINGS OF THE CLASS A (VOTING) MEMBER.

Meetings of the Class A (voting) Member, if any, shall be held at such places, times, and dates as determined by the Class A (voting) Member.  At any meeting, the Class A (voting) Member shall appoint a person to preside at the meeting and a person to act as secretary of the meeting.  The secretary of the meeting shall prepare minutes that shall be placed in the minute books of the Company.

6.2      NOTICE OF MEETING OR PROXY.

Notice of any meeting of the Class A (voting) Member or proxy may be given either personally or by first-class mail, facsimile, email, telegraphic, or other written communication addressed to the Class A (voting) Member and any other individual entitled to receive notice.  Notice shall be deemed to be given at the time when delivered personally; deposited in the mail; or sent by facsimile, email, telegram, or other means of written communication.

6.3      MEETINGS BY CONFERENCE TELEPHONE OR OTHER MEANS.

The Class A (voting) Member and others may participate in a meeting of the Class A (voting) Member by means of conference telephone or any other form of communication whereby all persons participating in the meeting can simultaneously hear each other during the meeting.  All participants are to be advised of the communications equipment, and the names of the participants in the conference are to be disclosed to all participants.  Participation in a meeting under this section constitutes presence in person at the meeting.  Unless otherwise restricted by the Articles or this Agreement, a meeting as specified in this section, may be conducted solely by means of remote communication.

6.4      PROXY.

The Class A (voting) Member may vote in person or appoint a proxy to vote for the Class A (voting) Member by signing an appointment or proxy form either personally or through its duly authorized attorney-in-fact.  Such proxy shall be filed with the Company or other officer or agent before or at the time of the meeting.  A proxy appointment is revocable by the Class A (voting) Member unless the appointment form states that it is irrevocable and such appointment is coupled with an interest.  An appointment coupled with an interest includes the appointment of a pledge, a Person who purchased or agreed to purchase the Class A (voting) Member's units, a creditor of the Company whose employment contract requires the appointment, or a party to a voting agreement.  Notwithstanding the foregoing, such an irrevocable appointment is revoked when the interest that it is coupled is extinguished.  A transferee for value of

**COMMERCIAL AUTO**                                                                        **CHI – 100 (09/20)**

membership units subject to an irrevocable appointment may revoke the appointment if the transferee did not know of its existence when the transferee acquired the units.

6.5     ACTION WITHOUT A MEETING.

Any action required or permitted to be taken by the Class A (voting) Member may be taken without a meeting if the Class A (voting) Member executes one or more written consents describing the action taken, signed before or after the intended effective date of the action by the Class A (voting) Member, or provided by electronic communication or transmission, and included in the minutes or filed with the Company's records reflecting the action taken.  In the case of consent by electronic communication or transmission, such communication or transmission shall set forth or be submitted with information from which it may be determined that the electronic communication or transmission was authorized by the Class A (voting) Member.

ARTICLE VII: DISTRIBUTIONS

7.1     DISTRIBUTIONS OF DISTRIBUTABLE CASH BY THE COMPANY.

Subject to applicable law and any limitations contained elsewhere in this Agreement, the Class A (voting) Member may decide from time to time to receive Distributable Cash.  In no circumstance shall any Class B (non-voting) Member be entitled to distributions of any kind.

7.2     RESTRICTION ON DISTRIBUTIONS.

No distribution shall be made if, after giving effect to the distribution:

(1)      The Company would not be able to pay its debts as they become due in the usual course of business; or

(2)      The Company's total assets would be less than the sum of its total liabilities.

ARTICLE VIII: TRANSFER AND ASSIGNMENT OF INTERESTS

8.1     TRANSFER AND ASSIGNMENT OF INTERESTS.

Any Member may Transfer all or any part of its Membership Interest, subject to the prior approval of the Class A (voting) Member and the provisions of this Article.  After the consummation of any Transfer of all or any part of a Membership Interest, the Membership Interest so Transferred shall continue to be subject to the terms and provisions of this Agreement, and any further Transfers shall be required to comply with all the terms and provisions of this Agreement.

8.2     FURTHER RESTRICTIONS ON TRANSFER OF INTERESTS.

In addition to other restrictions contained herein, a Member shall not Transfer all or any part of its Membership Interest unless the Member complies with all applicable federal and state laws.

8.3     SUBSTITUTED MEMBERS.

An Assignee of a Membership Interest shall become a substituted Member when:

(1)      The Class A (voting) Member approves the assignment;

(2)      The requirements of Section 8.2 are met;

County Hall Holdings LLC Operating Agreement 4836-8273-4383

**COMMERCIAL AUTO**                                                                    **CHI – 100 (09/20)**

(3)      The Assignee becomes a signatory to this Agreement and any amendment or restatement thereof; and

(4)      The Assignee pays any reasonable expenses incurred by the Company in connection with its admission as a Substituted Member.

### 8.4    EFFECTIVE DATE OF PERMITTED TRANSFERS.

Any permitted Transfer of all or any portion of a Membership Interest or an Economic Interest shall be effective provided all of the requirements in this Article have been met.  Except as may be otherwise agreed in writing, the admission of an Assignee as a Substituted Member shall release the Member who transferred the Membership Interest from any liability that such Member may have to the Company or to such Assignee.  Any transferee of a Membership Interest shall take subject to the restrictions on Transfer imposed by this Agreement.

### ARTICLE IX: ACCOUNTING, RECORDS, REPORTING BY MEMBERS

### 9.1    BOOKS AND RECORDS.

The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in a manner that enables the Company to prepare accurate and timely reports for, among other things, regulatory purposes and income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's Business.

### 9.2    TAX INFORMATION.

The Class A (voting) Member shall cause to be prepared annually, at Company expense, information regarding the Company necessary for the preparation of applicable federal and state income tax returns.  As soon as possible, the Company shall send or cause to be sent to each Member or Assignee such information as is necessary to complete such returns.

### 9.3    BANK ACCOUNTS.

The Class A (voting) Member shall establish, maintain and/or cause to be maintained the funds of the Company in one or more bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

### 9.4    ACCOUNTING DECISIONS AND RELIANCE ON OTHERS.

All decisions as to accounting matters shall be made by the Class A (voting) Member.  The Class A (voting) Member may rely upon the advice of the Company's accountants, counsel, agents and such other professionals the Class A (voting) Member deems prudent as to whether such decisions are in accordance with relevant accounting methods.

### 9.5    TAX MATTERS FOR THE COMPANY.

The Class A (voting) Member shall from time to time cause the Company to make such tax elections as it deems to be in the best interests of the Company and the Member.  The Class A (voting) Member or said Member's designee shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company's funds for professional services and costs associated therewith.  The Class A (voting) Member or its designee shall oversee the Company's tax affairs in the overall best interests of the Company.

**COMMERCIAL AUTO**                                                        **CHI – 100 (09/20)**

## ARTICLE X: DISSOLUTION AND WINDING UP

10.1    DISSOLUTION.

The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(1)    The consent of the Class A (voting) Member, or if there is more than one Class A (voting) Member, upon the consent of a majority of the Class A (voting) Members;

(2)    The occurrence of a Dissolution Event;

(3)    The sale of all or substantially all of the assets of Company;

(4)    The entry of a decree of judicial dissolution pursuant HRS §428-801(5); or

(5)    The issuance of a declaration of termination by the Director of the Department under HRS §428-810, unless such Director reinstates the Company under HRS §428-811.

10.2    WINDING UP.

Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Class A (voting) Member shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities and assets of Company, shall either cause its assets to be distributed or sold, and if sold (which shall be done as promptly as is consistent with obtaining the fair market value thereof), shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 10.3.

10.3    ORDER OF PAYMENT UPON DISSOLUTION.

After determining that all known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Class A (voting) Member in accordance with its positive Capital Account balance, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.  Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

10.4    LIMITATIONS ON PAYMENTS MADE IN DISSOLUTION.

Except as otherwise specifically provided in this Agreement, the Class A (voting) Member shall only be entitled to look solely at the assets of the Company for the return of its positive Capital Account balance.

## ARTICLE XI: INDEMNIFICATION AND INSURANCE

11.1    DEFINITIONS.

As used in this Article, unless the context indicates otherwise, the following definitions shall apply:

(a)    "Agent" means any Person who is or was a Member, officer, employee, or agent of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee, or agent of another foreign or domestic corporation, limited liability company, partnership, joint venture, trust, or other enterprise, or was a director, officer, employee, or agent of a foreign or domestic corporation that was a predecessor business entity of the Company or of another enterprise at the request of the predecessor business entity.

(b)    "Expenses" shall include, without limitation, reasonable attorneys' fees, disbursements and retainers, court costs, transcript costs, fees of accountants, experts and witnesses, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other expenses of the types customarily

incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, or being or preparing to be a witness or other participant in a Proceeding.

(c)      "Proceeding" includes any action, suit, arbitration, alternative dispute resolution mechanism, investigation, administrative hearing, or other proceeding, whether civil, criminal, administrative, or investigative in nature.

## 11.2      INDEMNIFICATION.

The Company shall have the power to defend and indemnify any Agent who was or is a party or is threatened to be made a party to any threatened, pending or completed Proceeding (other than a Proceeding by or in the right of the Company) by reason of the fact that the Agent was acting as such for the Company, against all Expenses, amounts paid in settlement, judgments, fines, penalties, and excise taxes actually and reasonably incurred by or levied against the Agent in connection with such Proceeding if the Class A (voting) Member determines that the Agent acted in good faith and in a manner that the Agent reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal Proceeding, had no reasonable cause to believe that the Agent's conduct was unlawful.  The Class A (voting) Member may cause the Company to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Class A (voting) Member deems appropriate in its business judgment.

The Company shall have the power to indemnify any Agent who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Agent is or was an Agent of the Company only against Expenses actually and reasonably incurred by the Agent in connection with such Proceeding if the Class A (voting) Member determines that the Agent acted in good faith and in a manner that the Agent reasonably believed to be in or not opposed to the best interests of the Company, except that no indemnification shall be made with respect to any claim, issue, or matter as to which the Agent shall have been adjudged liable to the Company unless and only to the extent that the court in which such Proceeding was brought or other court of competent jurisdiction shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, the Agent is fairly and reasonably entitled to indemnification for such Expenses which such court shall deem proper.

## 11.3      INSURANCE.

The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an Agent against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an Agent, whether or not the Company would have the power to indemnify such Person against such liability under this Article XI or under applicable law.

## 11.4      DETERMINATION OF CONDUCT.

If the Company indemnifies an Agent, then any such indemnification under Section 11.2 shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Agent is proper in the circumstances because the Agent has met the applicable standard of conduct set forth in Section 11.2.  Such determination shall be made by the Class A (voting) Member, in its sole discretion.

## 11.5      LIMITATIONS ON INDEMNIFICATION.

No payments under this Agreement shall be made by the Company if a court of competent jurisdiction finally determines that any indemnification or advance of Expenses hereunder is unlawful.

ARTICLE XII: MISCELLANEOUS

County Hall Holdings LLC Operating Agreement 4836-8273-4383

12.1     COUNSEL TO THE COMPANY.

The Class A (voting) Member may engage counsel to represent the Company.  Counsel to the Company may also be counsel to the Class A (voting) Member or any of its Affiliates.  The Class A (voting) Member may execute on behalf of the Company and the Class A (voting) Member any consent to the representation of the Company that counsel may request under the North Carolina Rules of Professional Conduct or similar rules in any other jurisdiction.

12.2     COMPLETE AGREEMENT.

This Agreement and the Articles constitute the complete and exclusive statement of agreement with respect to the subject matter herein and shall replace and supersede all prior written and oral agreements or statements.  No representation, statement, condition, or warranty not contained in this Agreement or the Articles will be binding on the Member or have any force or effect whatsoever.  To the extent that any provision of the Articles conflicts with any provision of this Agreement, the Articles shall control.

12.3     BINDING EFFECT.

Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members' successors and assigns.

12.4     PARTIES IN INTEREST.

Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their successors and assigns; nothing in this Agreement shall relieve or discharge the obligation or liability of any third person to the Company or the Members; and no provision in this Agreement shall give any third person any right of subrogation or action over or against any party to this Agreement.

12.5     PRONOUNS; STATUTORY REFERENCES.

All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, or to the singular or plural, as the context in which they are used may require. Any reference to the Act or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.6     HEADINGS.

All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

12.7     JURISDICTION.

The state and federal courts sitting in the State of North Carolina shall have exclusive jurisdiction over any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement.

12.8     EXHIBITS.

All Exhibits attached to this Agreement are incorporated herein and shall be treated as if set forth herein.

12.9     SEVERABILITY.

If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.10    NOTICES.

Any notice to be given to or to be served upon the Company or any party hereto in connection with this Agreement shall be in writing (which may include facsimile) and shall be deemed to have been given and received

when delivered to the address specified by the party to receive the notice.  Such notices shall be given to a Member at the address specified in Exhibit A hereto, and a copy of same shall be sent to the Company's designated captive manager.  Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

12.11   AMENDMENTS.

Any amendments to this Agreement or the Articles shall be in writing and signed by the Class A (voting) Member.  In the absence of any opinion of counsel as to the effect thereof, no amendment to this Agreement or the Articles shall be made that violates the Act or is likely to cause the Company to be taxed as a corporation.

12.12   RELIANCE ON AUTHORITY OF PERSON SIGNING AGREEMENT.

The Company shall not be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of the Member or to determine any fact or circumstance bearing upon the existence of the authority of such individual; and

12.13   TIME IS OF THE ESSENCE.

All dates and times in this Agreement are of the essence.

12.14   GOVERNING LAW.

This Agreement shall be exclusively governed by, and construed in accordance with, the laws of the State of North Carolina, and specifically the Act.

[The remainder of this page intentionally left blank; signature pages follow]

**COMMERCIAL AUTO**                                                                    **CHI – 100 (09/20)**

IN WITNESS WHEREOF, the parties have hereunto set their hands and acknowledge this Agreement and do hereby certify that the foregoing Agreement constitutes the Operating Agreement of County Hall Holdings, LLC, a North Carolina limited liability company, adopted by the Class A (voting) Member and the Company effective as of the Effective Date.

COMPANY:                                          CLASS A (VOTING) MEMBER:

COUNTY HALL HOLDINGS, LLC                         TRANS STAR HOLDING GROUP, LLC

A North Carolina Limited Liability Company        A Wyoming Limited Liability Company

By _____               By _____

Print Name _____               Print Name_____

Its _____              Its _____

**COMMERCIAL AUTO**                                                      **CHI – 100 (09/20)**

IN WITNESS WHEREOF, the parties have hereunto set their hands and acknowledge this Agreement and do hereby certify that the foregoing Agreement constitutes the Operating Agreement of County Hall Holdings, LLC, a North Carolina limited liability company, adopted by the Class A (voting) Member and the Company effective as of the Effective Date.

COMPANY:                                    CLASS B (NON-VOTING) MEMBER(S):

COUNTY HALL HOLDINGS, LLC                    ROAD BANG EXPRESS INC

A North Carolina Limited Liability Company   A

By _____          By _____

Print Name _____     Print Name _____

Its _____          Its _____

County Hall Holdings LLC Operating Agreement 4836-8273-4383

**COMMERCIAL AUTO**                                              **CHI – 100 (09/20)**

EXHIBIT A

COUNTY HALL HOLDINGS, LLC

MEMBER NAME, ADDRESS, AND CAPITAL CONTRIBUTIONS
(AS OF _____07/27/2023_____)

### CLASS A (VOTING)

| Name | Address | Initial Capital Contribution ($)/Date | # Membership Units | % Interest |
|---|---|---|---|---|
| Trans Star Holding Group, LLC | 1712 Pioneer Ave Ste 115 Cheyenne, WY 82001 | US$ 1,000,000.00 (April X, 2016) | 1 | 100% |

### CLASS B (NON-VOTING)

| Name | Address | Initial Capital Contribution ($)/Date | # Membership Units | % Interest |
|---|---|---|---|---|
| ROAD BANG EXPRESS INC | 3620 NW 30TH AVE LOT E506 MIAMI, FL 33142 | $1,241.02 07/27/2023 | 1 | 0% |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

COMMERCIAL AUTO
CA 01 28 06 17

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES

For a covered "auto" licensed or principally garaged in, or "auto dealer operations" conducted in, Florida, this endorsement modifies insurance provided under the following:

AUTO DEALERS COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Covered Autos Liability Coverage** is changed as follows:

Paragraph **(5)** of **a. Supplementary Payments** under **Coverage Extensions** in the Auto Dealers, Business Auto and Motor Carrier Coverage Forms is replaced by the following:

We will pay for the "insured":

**(5)** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**B. Physical Damage Coverage** is changed as follows:

**1.** No deductible applies under Specified Causes Of Loss or Comprehensive Coverage for "loss" to glass used in the windshield.

**2.** All other **Physical Damage Coverage** provisions will apply.

**C.** Paragraph **1.** of **Loss Conditions, Appraisal For Physical Damage Loss,** is replaced by the following:

**1. Appraisal For Physical Damage Loss**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". Upon notice of a demand for appraisal, the opposing party may, prior to appraisal, demand mediation of the dispute in accordance with the Mediation provision contained in this endorsement. The mediation must be completed before a demand for appraisal can be made. In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

© Insurance Services Office, Inc., 2016

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**D.** The **General Conditions** are amended as follows:

**1.** The following is added to the **Other Insurance** Condition in the Auto Dealers and Business Auto Coverage Forms, and **Other Insurance – Primary And Excess Provisions** Condition in the Motor Carrier Coverage Form:

**a.** When this Coverage Form and any other Coverage Form or policy providing liability coverage applies to an "auto" and:

**(1)** One provides coverage to a lessor of "autos" for rent or lease; and

**(2)** The other provides coverage to a person not described in Paragraph **D.1.a.(1);**

then the Coverage Form or policy issued to the lessor described in Paragraph **D.1.a.(1)** is excess over any insurance available to a person described in **D.1.a.(2)** if the face of the lease or rental agreement contains, in at least 10 point type, the following language:

The valid and collectible liability insurance and personal injury protection insurance of any authorized rental or leasing driver is primary for the limits of liability and personal injury protection coverage required by FLA. STAT. SECTION 324.021(7) and FLA. STAT. SECTION 627.736.

**2.** The following condition is added to the Auto Dealers, Business Auto and Motor Carrier Coverage Forms:

**Mediation**

**1.** In any claim filed by an "insured" with us for:

**a.** "Bodily injury" in an amount of $10,000 or less, arising out of the ownership, operation, use or maintenance of a covered "auto";

**b.** "Property damage" in any amount, arising out of the ownership, operation, maintenance or use of a covered "auto"; or

**c.** "Loss" to a covered "auto" or its equipment, in any amount;

either party may make a written demand for mediation of the claim prior to the institution of litigation.

**2.** A written request for mediation must be filed with the Florida Department of Financial Services on an approved form, which may be obtained from the Florida Department of Financial Services.

**3.** The request must state:

**a.** Why mediation is being requested.

**b.** The issues in dispute, which are to be mediated.

**4.** The Florida Department of Financial Services will randomly select mediators. Each party may reject one mediator, either before or after the opposing side has rejected a mediator. The mediator will notify the parties of the date, time and place of the mediation conference. The mediation conference will be held within 45 days of the request for mediation. The conference will be held by telephone if feasible. Participants in the mediation conference must have the authority to make a binding decision, and must mediate in good faith. Each party will bear the expenses of the mediation equally, unless the mediator determines that one party has not mediated in good faith.

**5.** Only one mediation may be requested for each claim unless all parties agree to further mediation. A party demanding mediation shall not be entitled to demand or request mediation after a suit is filed relating to the same facts already mediated.

**6.** The mediation shall be conducted as an informal process and formal rules of evidence and procedures need not be observed.

 © Insurance Services Office, Inc., 2016

COMMERCIAL AUTO
CA 02 67 06 17

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES –
# CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

AUTO DEALERS COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to the coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** Paragraph **A.2.b.** of the Common Policy Conditions, **Cancellation,** is replaced by the following:

  **b.** 45 days before the effective date of cancellation if we cancel for any other reason.

**B.** Paragraphs **A.4.** and **A.5.** of the Common Policy Conditions, **Cancellation,** are replaced by the following:

  **4.** Notice of cancellation will state the effective date of, and reason(s) for, the cancellation. The policy period will end on that date.

  **5.** If this Policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the return premium is not refunded with the notice of cancellation or when this Policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect, unless this is an audit policy.

If this is an audit policy, then, subject to your full cooperation with us or our agent in securing the necessary data for audit, we will return any premium refund due within 90 days of the date cancellation takes effect. If our audit is not completed within this time limitation, then we shall accept your own audit, and any premium refund due shall be mailed within 10 working days of receipt of your audit.

The cancellation will be effective even if we have not made or offered a refund.

**C.** The following is added to Paragraph **A.** of the Common Policy Conditions, **Cancellation:**

  **7.** If this Policy provides Personal Injury Protection, Property Damage Liability Coverage or both and:

  **a.** It is a new or renewal policy, it may not be cancelled by the first Named Insured during the first 60 days immediately following the effective date of the Policy or renewal, except for one of the following reasons:

    **(1)** The covered "auto" is completely destroyed such that it is no longer operable;

**(2)** Ownership of the covered "auto" is transferred; or

**(3)** The Named Insured has purchased another policy covering the motor vehicle insured under this Policy.

**b.** It is a new policy, we may not cancel it during the first 60 days immediately following the effective date of the Policy for nonpayment of premium unless a check used to pay us is dishonored for any reason or any other type of premium payment is subsequently determined to be rejected or invalid.

**D.** The following condition is added:

**Nonrenewal**

**1.** If we decide not to renew or continue this Policy, we will mail you notice at least 45 days before the end of the policy period. If we offer to renew or continue and you do not accept, this Policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

**2.** If we fail to mail proper notice of nonrenewal and you obtain other insurance, this Policy will end on the effective date of that insurance.

**3.** Notice of nonrenewal will state the reason(s) for the nonrenewal and the effective date of nonrenewal. The policy period will end on that date.

© Insurance Services Office, Inc., 2016
CA 02 67 06 17

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MCS-90 REIMBURSEMENT ENDORSEMENT

It is hereby understood and agreed that the following provision is added to the policy:

**A. Form MCS-90 Right to Reimbursement**

Your policy contains the Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980, known as Form MCS-90, which requires us to pay damages for certain claims or "suits" that are not covered under the policy. Form MCS-90 gives us the right to seek reimbursement from you for any damages we pay as a result of a final judgment against you that triggers the Form MCS-90 on your policy.

**B. Additional Right to Reimbursement for Settlements**

This endorsement gives us the following additional rights with respect to the Form MCS-90 on this policy:

**1.** We have the right to settle any claim or "suit" against you that triggers the Form MCS-90 on this policy, as we consider appropriate, and without your prior consent.

**2.** Any such settlement we enter into on your behalf will be deemed a final judgment entered against you for purposes of our rights under the Form MCS-90.

**3.** We thus have the right to seek reimbursement from you for the full amount of any such settlement, as if it were a final judgment.

**All Other Terms and Conditions of the Policy Remain Unchanged**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXTRINSIC EVIDENCE, INDEPENDENT COUNSEL and
## CHOICE OF LAW ENDORSEMENT

This endorsement modifies insurance provided under the following:
**MOTOR CARRIER COVERAGE FORM**

It is hereby understood and agreed that the following provisions are added to the policy:

**A. Extrinsic Evidence**

   **1.** We are not limited to the facts alleged in any complaint or pleading in making the determination of our duty to defend any claim or "suit" presented or tendered to us for coverage under the policy.

   **2.** We have the right to use evidence and information extrinsic to any complaint or pleading, including evidence and information obtained during the course of our investigation, in making the determination of our duty to defend any claim or "suit" presented or tendered to us for coverage under the policy.

**B. Independent Counsel**

   We have the right to select counsel to defend any "insured" or indemnitee that is entitled to a defense under the policy. However, if:

   **1.** An "insured" or indemnitee is entitled by law to select independent counsel, at our expense, to defend any claim or "suit" to which this insurance applies; and

   **2.** That "insured" or indemnitee elects to retain independent counsel;

   then our duty to pay attorneys' fees and other defense costs for such independent counsel is limited to the rates we actually pay to counsel we retain in the ordinary course of business in the defense of similar claims in the venue where the claim or "suit" is pending.

**C. Choice of Law**

   **1.** All "insureds" and all other parties seeking benefits under, or arising out of, or in any way related to this policy acknowledge and understand that all claims under the policy will be handled by our third-party claim administrator in Omaha, Nebraska, and agree that this policy and all endorsements or modifications to the policy, and all actions related to the handling of claims under the policy, shall be interpreted under and governed by the laws of the State of Nebraska;

   **2.** All "insureds" and all other parties seeking benefits under, or arising out of, or in any way related to this policy acknowledge and agree that all litigation arising out of or related to this policy or any endorsements or modifications to the policy, and all actions related to the handling of claims under the policy, shall take place in the State of Nebraska; and

   **3.** Nothing in this endorsement shall impair any party's right to remove a state court lawsuit to a federal court sitting in the State of Nebraska.

**D. Severability and Construction**

   **1.** If any provision contained in this endorsement is, for any reason, held to be invalid, illegal, or unenforceable in any respect, it is hereby deemed to be severed and to have no effect on any other valid, legal and enforceable provision of this endorsement; and

   **2.** If any provision contained in this endorsement is, for any reason, held to be invalid, illegal, or unenforceable, it will be construed by limiting it so as to be valid, legal, and enforceable to the extent compatible with applicable law.

**All Other Terms and Conditions of the Policy Remain Unchanged**

## County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CROSS SUITS EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:
**MOTOR CARRIER COVERAGE FORM**

It is hereby understood and agreed that the following exclusion is added to the policy:

**1.    Cross Suits Exclusion**

This insurance does not apply to liability or damages of any kind arising from claims or "suits" brought by one "insured" against another "insured", whether such claims or "suits" are for direct damages, indemnification, contribution, or involve any other type of action.

**All Other Terms and Conditions of the Policy Remain Unchanged**

COMMERCIAL AUTO                                                    CHI - 320 (02/19)

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYEE INDEMNIFICATION, EMPLOYER'S LIABILITY, AND CONTRACTOR DAMAGES

This endorsement modifies insurance provided under the following:
**MOTOR CARRIER COVERAGE FORM**

It is hereby understood and agreed that **SECTION II – LIABILITY COVERAGE**, **B. Exclusions**, **4. Employee Indemnification and Employer's Liability** is deleted in its entirety and replaced with the following:

**4. Employee Indemnification, Employer's Liability, and Contractor Damages**

**a.** This insurance does not apply to liability or damages for "bodily injury" to or "property damage" sustained by:

**(1)** Any "employee" of any "insured" arising out of or in the course of:

**(i)** Employment by any "insured"; or

**(ii)** Performing duties related to the conduct of any "insured's" business;

**(2)** Any "contractor" hired or retained by or for any "insured";

**(3)** Any "employee" of any "contractor" hired or retained by or for any "insured";

**(4)** Any "contractor" or "employee" of any "contractor" who hires or retains any "insured" or any "employee" of any "insured"; or

**(5)** The spouse, child, parent, brother, or sister of any "insured", "employee", "contractor", or "employee" of any "contractor" as a consequence of (**1**), **(2), (3)**, or **(4)** above.

**b.** This exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity;

**(2)** To any obligation of any "insured" to share damages with or indemnify someone else who must pay damages because of the "bodily injury" or "property damage" to which this exclusion applies; and

**(3)** To liability assumed by any "insured" under an ""insured contract".

**c.** Solely for purposes of this endorsement, the following definition applies:

"**Contractor**" includes:

**(1)** Any independent contractor, subcontractor, developer, or general contractor, other than an "employee" of any "insured":

**(i)** For whom any "insured" renders or performs services of any kind; or

**(ii)** Who renders or performs services of any kind for or on behalf of any "insured";

whether pursuant to a written contract, an oral agreement, or any formal or informal arrangement of any kind and regardless of where the services are performed or where the "bodily injury" or "property damage" takes place;

**(2)** Any driver or co-driver of a covered "auto", other than "employees" of any "insured"; and

**(3)** Any other persons hired, loaned, leased, borrowed, contracted, or volunteering for the purpose of providing services to, for, or on behalf of any "insured", whether or not paid for such services, other than "employees" of any "insured".

**All Other Terms and Conditions of the Policy Remain Unchanged**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTAIN SCHEDULED AUTOS DEEMED
## COVERED AUTOS YOU OWN

This endorsement modifies insurance provided under the following:
**MOTOR CARRIER COVERAGE FORM**

**A.** Solely for purposes of sub-paragraph **2.** under paragraph **B. Owned Autos You Acquire After The Policy Begins,** and sub-paragraph **3.** under paragraph **C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos,** in **SECTION I – COVERED AUTOS**, any "auto" shown in **Item Three** of the **Declarations** that is a "leased auto" will be considered a covered "auto" you own.

**B.** Solely for purposes of this endorsement, the following definition applies:

**"Leased auto"** means an "auto" leased or rented to you pursuant to a written contract or agreement under which the owner or lessor of the "auto" gives you exclusive possession, control, and use of the "auto" for operation in your business as a "motor carrier" for hire. To qualify as a "leased auto", the written contract or agreement must:

**1.** Be signed by you and the owner or lessor of the "auto" prior to the date of the "accident";

**2.** Have a lease or rental term of more than thirty days; and

**3.** Specifically identify the "auto" being leased or rented to you.

**All Other Terms and Conditions of the Policy Remain Unchanged**

Case 1:24-cv-21623-KMM   Document 1-2   Entered on FLSD Docket 04/26/2024   Page 65 of 75

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# USE OF COVERED "TRAILER" BY OTHERS EXCLUSION

This endorsement modifies insurance provided under the following:
**MOTOR CARRIER COVERAGE FORM**

It is hereby understood and agreed that the following exclusion is added to the policy:

1. **Use of Covered "Trailer" by Others**
   This insurance does not apply to liability or damages for "bodily injury" or "property damage" arising out of the operation, maintenance, or use of a covered "auto" that is a "trailer" when the "trailer" is operating under the authority or dispatch of, or in the possession of:

   a.  Any other "motor carrier"; or

   b.  Any other person or organization that leased, hired, rented, loaned, or borrowed the "trailer" from any "insured".

**All Other Terms and Conditions of the Policy Remain Unchanged**

# County Hall Insurance Company, Inc., a Risk Retention Group

401 Hawthorne Lane Suite 110 #226
Charlotte, NC 28204
**NAIC #** 15947

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PASSENGER EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:
**MOTOR CARRIER COVERAGE FORM**

It is hereby understood and agreed that the following exclusion is added to the policy:

1.  **Passenger Exclusion**

    a.  This insurance does not apply to liability or damages for "bodily injury" to or "property damage" sustained by any passenger or other occupant of a covered "auto" that arises out of an "accident" occurring while such passenger or other occupant is:

        (1)  In;

        (2)  On;

        (3)  Entering into; or

        (4)  Exiting from

        a covered "auto".

    b.  If this exclusion is invalid or unenforceable in the state or territory where an "accident" occurs because of a state or federal financial responsibility law, we will provide the minimum Limit of Liability necessary to comply with such law. However, we have the right to seek reimbursement from you for any amounts we pay as a result of damages otherwise excluded under this endorsement.

### All Other Terms and Conditions of the Policy Remain Unchanged

POLICY NUMBER:  CHL 01-05226-23

**COMMERCIAL AUTO**
**CA 22 10 02 18**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA PERSONAL INJURY PROTECTION

For a covered "auto" licensed or principally garaged in, or "auto dealer operations" conducted in, Florida, this endorsement modifies insurance provided under the following:

AUTO DEALERS COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the Policy effective on the inception date of the Policy unless another date is indicated below.

| | |
|---|---|
| **Named Insured:** ROAD BANG EXPRESS INC | |
| **Endorsement Effective Date:** 07/27/2023 | |

We agree with the "named insured", subject to all the provisions of this endorsement and to all of the provisions of the Policy except as modified herein, as follows that:

**SCHEDULE**

| |
|---|
| Any Personal Injury Protection deductible shown in the Declarations of   **$ 0.00** |
| is applicable to ☐ the following "named insured" only: |
| ☐ each "named insured" and each dependent "family member". |
| ☐ Work loss for "named insured" does not apply. |
| ☐ Work loss for "named insured" and dependent "family member" does not apply. |

| Benefits | Limit Per Person |
|---|---|
| Total Aggregate Limit for all Personal Injury Protection Benefits, except Death Benefits | $10,000 |
| Death Benefits | $5,000 |
| Medical Expenses | 80% of medical expenses subject to the total aggregate limit and the provisions of Paragraphs **D.2.a.** and **b.** under Limit Of Insurance. |
| Work Loss | 60% of work loss subject to the total aggregate limit |
| Replacement Services Expenses | subject to the total aggregate limit |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

## A. Coverage

We will pay Personal Injury Protection benefits in accordance with the Florida Motor Vehicle No-fault Law to or for an "insured" who sustains "bodily injury" in an "accident" arising out of the ownership, maintenance or use of a "motor vehicle". Subject to the limits shown in the Schedule, these Personal Injury Protection benefits consist of the following:

### 1. Medical Expenses

**a.** All reasonable "medically necessary" expenses for medical, surgical, X-ray, dental, ambulance, hospital, professional nursing and rehabilitative services, including prosthetic devices. However, we will pay for these benefits only if the "insured" receives initial services and care within 14 days after the "motor vehicle" "accident" that are:

**(1)** Lawfully provided, supervised, ordered or prescribed by a licensed physician, dentist or chiropractic physician;

**(2)** Provided in a hospital or in a facility that owns, or is wholly owned by, a hospital; or

**(3)** Provided by a person or entity licensed to provide emergency transportation and treatment;

as authorized by the Florida Motor Vehicle No-fault Law.

**b.** Upon referral by a licensed health care provider described in Paragraph **A.1.a.(1), (2)** or **(3),** follow-up services and care consistent with the underlying medical diagnosis rendered pursuant to Paragraph **A.1.a.,** if provided, supervised, ordered or prescribed only by a licensed:

**(1)** Physician, osteopathic physician, chiropractic physician or dentist; or

**(2)** Physician assistant or advanced registered nurse practitioner, under the supervision of such physician, osteopathic physician chiropractic physician or dentist;

as authorized by the Florida Motor Vehicle No-fault Law.

Follow-up services and care may also be provided by:

**(3)** A licensed hospital or ambulatory surgical center;

**(4)** An entity wholly owned by one or more licensed physicians, osteopathic physicians, chiropractic physicians or dentists; or by such practitioners and the spouse, parent, child, or sibling of such practitioners;

**(5)** An entity that owns or is wholly owned, directly or indirectly, by a hospital or hospitals;

**(6)** A licensed physical therapist, based upon referral by a provider described in Paragraph **A.1.b.;** or

**(7)** A health care clinic licensed under the Florida Health Care Clinic Act:

**(a)** Which is accredited by the Joint Commission on Accreditation of Healthcare Organizations, the American Osteopathic Association, the Commission on Accreditation of Rehabilitation Facilities or the Accreditation Association for Ambulatory Health Care, Inc.; or

**(b)** Which:

**(i)** Has a licensed medical director;

**(ii)** Has been continuously licensed for more than three years or is a publicly traded corporation that issues securities traded on an exchange registered with the United States Securities and Exchange Commission as a national securities exchange; and

**(iii)** Provides at least four of the following medical specialties:

**i.** General medicine;

**ii.** Radiography;

**iii.** Orthopedic medicine;

**iv.** Physical medicine;

**v.** Physical therapy;

**vi.** Physical rehabilitation;

**vii.** Prescribing or dispensing outpatient prescription medication; or

**viii.** Laboratory services;

as authorized by the Florida Motor Vehicle No-fault Law.

However, with respect to Paragraph **A.1.,** medical expenses do not include massage or acupuncture, regardless of the person, entity or licensee providing the massage or acupuncture;

© Insurance Services Office, Inc., 2017

**2. Replacement Services Expenses**

With respect to the period of disability of the injured person, all expenses reasonably incurred in obtaining from others ordinary and necessary services in lieu of those that, but for such injury, the injured person would have performed without income for the benefit of his or her household;

**3. Work Loss**

With respect to the period of disability of the injured person, any loss of income and earning capacity from inability to work proximately caused by the injury sustained by the injured person; and

**4. Death Benefits**

**B. Who Is An Insured**

1. The "named insured".

2. If the "named insured" is an individual, any "family member".

3. Any other person while "occupying" a covered "motor vehicle" with the "named insured's" consent.

4. A "pedestrian" if the "accident" involves the covered "motor vehicle".

**C. Exclusions**

We will not pay Personal Injury Protection benefits for "bodily injury":

1. Sustained by the "named insured" or any "family member" while "occupying" any "motor vehicle" owned by the "named insured" that is not a covered "motor vehicle";

2. Sustained by any person while operating the covered "motor vehicle" without the "named insured's" expressed or implied consent;

3. Sustained by any person, if such person's conduct contributed to his or her "bodily injury" under any of the following circumstances:

   **a.** Causing "bodily injury" to himself or herself intentionally; or

   **b.** While committing a felony;

4. To the "named insured" or any "family member" for work loss if an entry in the Schedule or Declarations indicates that coverage for work loss does not apply;

5. To any "pedestrian", other than the "named insured" or any "family member", not a legal resident of the state of Florida;

6. To any person, other than the "named insured", if that person is the "owner" of a "motor vehicle" for which security is required under the Florida Motor Vehicle No-fault Law;

7. To any person, other than the "named insured", or any "family member", who is entitled to personal injury protection benefits from the owner of a "motor vehicle" that is not a covered "motor vehicle" under this insurance or from the "owner's" insurer; or

8. To any person who sustains "bodily injury" while "occupying" a "motor vehicle" located for use as a residence or premises.

**D. Limit Of Insurance**

1. Regardless of the number of persons insured, policies or bonds applicable, premiums paid, vehicles involved or claims made, the total aggregate limit of personal injury protection benefits, available under the Florida Motor Vehicle No-fault Law from all sources combined, including this Policy, for or on behalf of any one person who sustains "bodily injury" as the result of any one "accident", shall be:

   **a.** $10,000 for medical expenses, work loss and replacement services; and

   **b.** $5,000 for death benefits.

2. Subject to Paragraph **D.1.a.,** we will pay:

   **a.** Up to $10,000 for medical expenses, if a licensed physician, dentist, physician assistant or an advanced registered nurse practitioner authorized by the Florida Motor Vehicle No-fault Law has determined that the "insured" had an "emergency medical condition"; or

   **b.** Up to $2,500 for medical expenses, if any health care provider described in Paragraph **A.1.a.** or **A.1.b.** has determined that the "insured" did not have an "emergency medical condition".

3. Any amount paid under this coverage will be reduced by the amount of benefits an injured person has been paid or is entitled to be paid for the same elements of "loss" under any workers' compensation law.

4. If personal injury protection benefits, under the Florida Motor Vehicle No-fault Law, have been received from any insurer for the same elements of loss and expense benefits available under this Policy, we will not make duplicate payments to or for the benefit of the injured person. The insurer paying the benefits shall be entitled to recover from us its pro rata share of the benefits paid and expenses incurred in handling the claim.

5. The deductible amount shown in the Schedule will be deducted from the total amount of expenses and losses listed in Paragraphs **A.1.**, **A.2.** and **A.3.** of this endorsement before the application of any percentage limitation for each "insured" to whom the deductible applies. The deductible does not apply to the death benefit.

6. Any amount paid under this coverage for medical expenses shall be limited by the medical fee schedule prescribed by the Florida Motor Vehicle No-fault Law.

### E. Changes In Conditions

The **Conditions** are changed for **Personal Injury Protection** as follows:

1. **Duties In The Event Of Accident, Claim, Suit Or Loss** is replaced by the following:

   Compliance with the following duties is a condition precedent to receiving benefits:

   In the event of an "accident", the "named insured" must give us or our authorized representative prompt written notice of the "accident".

   If any injured person or his or her legal representative institutes a legal action to recover damages for "bodily injury" against a third party, a copy of the summons, complaint or other process served in connection with that legal action must be forwarded to us as soon as possible by the injured person or his or her legal representative.

   A person seeking personal injury protection benefits must, as soon as possible, give us written proof of claim, under oath if required, containing full particulars concerning the injuries and treatment received and/or contemplated, and send us any other information that will assist us in determining the amount due and payable.

A person seeking personal injury protection benefits must submit to an examination under oath. The scope of questioning during the examination under oath is limited to relevant information or information that could reasonably be expected to lead to relevant information.

2. **Legal Action Against Us** is replaced by the following:

   **Legal Action Against Us**

   **a.** No legal action may be brought against us until there has been full compliance with all terms of this Policy. In addition, no legal action may be brought against us:

   **(1)** Until the claim for benefits is overdue in accordance with Paragraph **F.2.** of this endorsement; and

   **(2)** Until we are provided with a demand letter in accordance with the Florida Motor Vehicle No-fault Law sent to us via U.S. certified or registered mail; and

   **(3)** With respect to the overdue claim specified in the demand letter, if, within 30 days of receipt of the demand letter, we:

   **(a)** Pay the overdue claim; or

   **(b)** Agree to pay for future treatment not yet rendered;

   in accordance with the requirements of the Florida Motor Vehicle No-fault Law.

   **b.** If legal action is brought against us, all claims related to the same health care provider or facility shall be brought in a single action, unless good cause can be shown why such claims should be brought separately.

3. **Transfer Of Rights Of Recovery Against Others To Us** is replaced by the following:

**Transfer Of Rights Of Recovery Against Others To Us**

Unless prohibited by the Florida Motor Vehicle No-fault Law, in the event of payment to or for the benefit of any injured person under this coverage:

**a.** We will be reimbursed for those payments, not including reasonable attorneys' fees and other reasonable expenses, from the proceeds of any settlement or judgment resulting from any right of recovery of the injured person against any person or organization legally responsible for the "bodily injury" from which the payment arises. We will also have a lien on those proceeds.

**b.** If any person to or for whom we pay benefits has rights to recover benefits from another, those rights are transferred to us. That person must do everything necessary to secure our rights and must do nothing after loss to impair them.

**c.** The insurer providing personal injury protection benefits on a private passenger "motor vehicle", as defined in the Florida Motor Vehicle No-fault Law, shall be entitled to reimbursement to the extent of the payment of personal injury protection benefits from the "owner" or the insurer of the "owner" of a commercial "motor vehicle", as defined in the Florida Motor Vehicle No-fault Law, if such injured person sustained the injury while "occupying", or while a "pedestrian" through being struck by, such commercial "motor vehicle". However, such insurer's right of reimbursement under this Paragraph **c.** does not apply to an "owner" or registrant of a "motor vehicle" used as a taxicab.

4. **Concealment, Misrepresentation Or Fraud** is replaced by the following:

**Concealment, Misrepresentation Or Fraud**

We do not provide coverage under this endorsement for an "insured" if that "insured" has committed, by a material act or omission, insurance fraud relating to personal injury protection coverage under this form, if fraud is admitted to in a sworn statement by the "insured" or if the fraud is established in a court of competent jurisdiction. Any insurance fraud voids all personal injury protection coverage arising from the claim with respect to the "insured" who committed the fraud. Any benefits paid prior to the discovery of the fraud are recoverable from that "insured".

5. **Policy Period, Coverage Territory** is replaced by the following:

**Policy Period, Coverage Territory**

The insurance under this section applies only to "accidents" which occur during the policy period:

**a.** In the state of Florida;

**b.** As respects the "named insured" or any "family member", while "occupying" the covered "motor vehicle" outside the state of Florida but within the United States of America, its territories or possessions or Canada; and

**c.** As respects the "named insured", while "occupying" a "motor vehicle" of which a "family member" is the "owner" and for which security is maintained under the Florida Motor Vehicle No-fault Law outside the state of Florida but within the United States of America, its territories or possessions or Canada.

 © Insurance Services Office, Inc., 2017

## F. Additional Conditions

The following conditions are added:

**1. Mediation**

**a.** In any claim filed by an "insured" with us for:

**(1)** "Bodily injury" in an amount of $10,000 or less, arising out of the ownership, operation, use or maintenance of a covered "auto";

**(2)** "Property damage" in any amount, arising out of the ownership, operation, maintenance or use of a covered "auto"; or

**(3)** "Loss" to a covered "auto" or its equipment, in any amount,

either party may make a written demand for mediation of the claim prior to the institution of litigation.

**b.** A written request for mediation must be filed with the Florida Department of Financial Services on an approved form, which may be obtained from the Florida Department of Financial Services.

**c.** The request must state:

**(1)** Why mediation is being requested.

**(2)** The issues in dispute, which are to be mediated.

**d.** The Florida Department of Financial Services will randomly select mediators. Each party may reject one mediator, either before or after the opposing side has rejected a mediator. The mediator will notify the parties of the date, time and place of the mediation conference. The mediation conference will be held within 45 days of the request for mediation. The conference will be held by telephone, if feasible. Participants in the mediation conference must have the authority to make a binding decision, and must mediate in good faith. Each party will bear the expenses of the mediation equally, unless the mediator determines that one party has not mediated in good faith.

**e.** Only one mediation may be requested for each claim unless all parties agree to further mediation. A party demanding mediation shall not be entitled to demand or request mediation after a suit is filed relating to the same facts already mediated.

**f.** The mediation shall be conducted as an informal process and formal rules of evidence and procedures need not be observed.

**2. Payment Of Benefits**

Personal injury protection benefits payable under this Coverage Form, whether the full or partial amount, may be overdue if not paid within 30 days after we are furnished with written notice of the covered loss and the amount of the covered loss in accordance with the Florida Motor Vehicle No-fault Law.

However, if we have a reasonable belief that a fraudulent insurance act has been committed relating to personal injury protection coverage under this Coverage Form, we will notify the "insured" in writing, within 30 days after the submission of the claim, that the claim is being investigated for suspected fraud. No later than 90 days after the submission of the claim, we will either deny or pay the claim, in accordance with the Florida Motor Vehicle No-fault Law.

If we pay only a portion of a claim or reject a claim due to an alleged error in the claim, we, at the time of the partial payment or rejection, will provide an itemized specification or explanation of benefits due to the specified error. Upon receiving the specification or explanation, the person making the claim, at the person's option and without waiving any other legal remedy for payment, has 15 days to submit a revised claim, which will be considered a timely submission of written notice of a claim.

**3. Modification Of Policy Coverages**

Any Automobile Medical Payments Coverage and any Uninsured Motorists Coverage afforded by the Policy shall be excess over any personal injury protection benefits paid or payable.

Regardless of whether the full amount of personal injury protection benefits has been exhausted, any Medical Payments Coverage afforded by the Policy shall pay the portion of any claim for personal injury protection medical expenses which are otherwise covered but not payable due to the limitation of 80% of medical expense benefits but shall not be payable for the amount of the deductible selected.

© Insurance Services Office, Inc., 2017

**4. Medical Reports And Examinations; Payment Of Claim Withheld**

As soon as practicable, the person making the claim shall submit to mental and physical examinations at our expense when and as often as we may reasonably require and a copy of the medical report shall be forwarded to such person if requested. If the person unreasonably refuses to submit to, or fails to appear at, an examination, we will not be liable for subsequent personal injury protection benefits. Such person's refusal to submit to, or failure to appear at, two examinations, raises a rebuttable presumption that such person's refusal or failure was unreasonable.

Whenever a person making a claim as a result of an injury sustained while committing a felony is charged with committing that felony, we shall withhold benefits until, at the trial level, the prosecution makes a formal entry on the record that it will not prosecute the case against the person, the charge is dismissed or the person is acquitted.

**5. Provisional Premium**

In the event of any change in the rules, rates, rating plan, premiums or minimum premiums applicable to the insurance afforded, because of an adverse judicial finding as to the constitutionality of any provisions of the Florida Motor Vehicle No-fault Law providing for the exemption of persons from tort liability, the premium stated in the Declarations for any Liability, Medical Payments and Uninsured Motorists insurance shall be deemed provisional and subject to recomputation. If this Policy is a renewal policy, such recomputation shall also include a determination of the amount of any return premium previously credited or refunded to the "named insured" pursuant to the Florida Motor Vehicle No-fault Law with respect to insurance afforded under a previous policy.

If the final premium thus recomputed exceeds the premium shown in the Declarations, the "named insured" shall pay to us the excess as well as the amount of any return premium previously credited or refunded.

**6. Special Provisions For Rented Or Leased Vehicles**

Notwithstanding any provision of this coverage to the contrary, if a person is injured while "occupying", or through being struck by, a "motor vehicle" rented or leased under a rental or lease agreement which does not specify otherwise in language required by FLA. STAT. SECTION 627.7263(2) in at least 10-point type on the face of the agreement, the personal injury protection benefits available under the Florida Motor Vehicle No-fault Law and afforded under the lessor's policy shall be primary.

**7. Insured's Right To Personal Injury Protection Information**

**a.** In a dispute between us and an "insured", or between us and an assignee of the "insured's" personal injury protection benefits, we will, upon request, notify such "insured" or assignee that the limits for Personal Injury Protection have been reached. We will provide such information within 15 days after the limits for Personal Injury Protection have been reached.

**b.** If legal action is commenced, we will, upon request, provide an "insured" with a copy of a log of personal injury protection benefits paid by us on behalf of the "insured". We will provide such information within 30 days of receipt of the request for the log from the "insured".

**G. Additional Definitions**

As used in this endorsement:

**1.** "Emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following:

**a.** Serious jeopardy to "insured's" health;

**b.** Serious impairment to bodily functions; or

**c.** Serious dysfunction of any bodily organ part.

 © Insurance Services Office, Inc., 2017

**2.** "Motor vehicle" means any self-propelled vehicle with four or more wheels which is of a type both designed and required to be licensed for use on the highways of Florida and any trailer or semitrailer designed for use with such vehicle.

However, "motor vehicle" does not include:

  **a.** A mobile home;

  **b.** Any "motor vehicle" which is used in mass transit, other than public school transportation, and designed to transport more than five passengers exclusive of the operator of the motor vehicle and which is owned by a municipality, a transit authority or a political subdivision of the state.

**3.** "Family member" means a person related to the "named insured" by blood, marriage or adoption, including a ward or foster child, who is a resident of the same household as the "named insured".

**4.** "Named insured" means the person or organization named in the Declarations of the Policy and, if an individual, shall include the spouse if a resident of the same household.

**5.** "Occupying" means in or upon or entering into or alighting from.

**6.** "Owner" means a person or organization who holds the legal title to a "motor vehicle" and also includes:

  **a.** A debtor having the right to possession, in the event a "motor vehicle" is the subject of a security agreement;

  **b.** A lessee having the right to possession, in the event a "motor vehicle" is the subject of a lease with option to purchase and such lease agreement is for a period of six months or more; and

  **c.** A lessee having the right to possession, in the event a "motor vehicle" is the subject of a lease without option to purchase, and such lease is for a period of six months or more, and the lease agreement provides that the lessee shall be responsible for securing insurance.

**7.** "Pedestrian" means a person while not an occupant of any self-propelled vehicle.

**8.** "Medically necessary" refers to a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing or treating an illness, injury, disease or symptom in a manner that is:

  **a.** In accordance with generally accepted standards of medical practice;

  **b.** Clinically appropriate in terms of type, frequency, extent, site and duration; and

  **c.** Not primarily for the convenience of the patient, physician or other health care provider.

© Insurance Services Office, Inc., 2017

COMMERCIAL AUTO                                                         CHI-CRI 12/20

7ci bhm<U``=bgifUbWY7ca dUbmž=bWžUF]g_FYhYbh]cb`;fci d
($%<U`hžcfbY`@UbYžGi]hY`%%$`&&*
7\Uf`chhYžB7`&,&$(

## Policyholder Notice - Claim Reporting Instructions

We are pleased that you have chosen County Hall Insurance Company, Inc., a Risk Retention Group as your insurance carrier.

We look forward to being of service to you should the need ever arise. County Hall Insurance Company Claims Department handles claims which arise under policies written within the County Hall Insurance Company, Inc., a Risk Retention Group for the program in which your coverage was placed.  Notice of any claim, suit or incident should be reported as soon as possible.

In the event of a loss or claim involving damage under this policy, please provide immediate notification to:

**County Hall Insurance Company Claims Department (Claim Administrator for this policy)**

Toll Free Claim Reporting:              1-888-816-2227
Phone Claim Reporting:                 402-513-7840
E-Mail Claim Reporting:            claim@countyhallrrg.com
Fax Claim Reporting:                    800-754-8440

**Mailing Address:**
County Hall Insurance Company Claims Department
4089 S. 84th St. #226
Omaha, NE 68127